**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **BRANCH METRICS, INC.**,<br><br>Plaintiff,<br>v.<br><br>**GOOGLE LLC**,<br><br>Defendant. | Case No. _______________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................................................................................1

PARTIES ...............................................................................................................12

JURISDICTION AND VENUE ...............................................................................13

FACTUAL ALLEGATIONS ....................................................................................14

I. PLAINTIFF BRANCH AND BRANCH DISCOVERY SEARCH ....................14

II. RELEVANT MARKETS ..................................................................................19

A. Android Application Search Services .......................................................19

i. Android Application Search Services Worldwide (Excluding China) Is a Relevant Antitrust Market ..........................................19

ii. Google Has Monopoly Power in Android Application Search Services Worldwide (Excluding China) ..........................................23

iii. Branch Participates and Competes with Google in the Market for Android Application Search Services Worldwide (Excluding China) .............................................................................23

B. General Search Services ...........................................................................25

i. General Search Services in the U.S. Is a Relevant Antitrust Market .................................................................................................25

ii. Google Has Monopoly Power in the U.S. General Search Services Market ....................................................................................27

iii. Branch, Google, and Others Perceive Branch as a Competitor and Potential Substitute for General Search Services in the U.S. ..............28

C. Android App Distribution ..........................................................................34

i. Android App Distribution Worldwide (Excluding China) Is a Relevant Antitrust Market ...................................................................34

ii. Google Has Monopoly Power in Android App Distribution Worldwide (Excluding China) ...........................................................37

iii. Branch Participates and Competes with Google in the Android App Distribution Market Worldwide (Excluding China) .......................40

D. Search Advertising ....................................................................................47

i. Search Advertising in the U.S. is a Relevant Antitrust Market ....47

ii. Google Has Monopoly Power in the U.S. Search Text Advertising Market ....49

iii. Branch Participates and Competes with Google in the U.S. Search Text Advertising Market ....49

III. GOOGLE'S UNLAWFUL CONDUCT ....50

A. Google's Anticompetitive Android Agreements With OEMs and Carriers ....50

i. Mobile Application Distribution Agreements (MADAs) ....50

ii. Revenue Share Agreements (RSAs) ....56

iii. Additional Android Agreements ....67

B. Google's Anticompetitive Campaign Against Direct Downloading of Apps ....69

C. Google's Anticompetitive Agreements With Apple and Browser Distributors ....71

IV. ANTICOMPETITIVE EFFECTS AND INJURY TO COMPETITION ....73

A. Application Search Services ....75

B. General Search Services ....77

C. Android App Distribution ....79

D. Search Advertising ....81

CLAIMS ALLEGED ....82

DEMAND FOR JURY TRIAL ....106

PRAYER FOR RELIEF ....106

## PRELIMINARY STATEMENT

1. Nearly twenty-five years ago, Microsoft was condemned for violating the antitrust laws as a technology monopolist, using anticompetitive agreements to foreclose rivals, including through exclusivity agreements, tying arrangements, and pre-installed, undeletable, default software. At that time, Google was a startup in Silicon Valley, with innovative technology to search the then-emerging internet and a generous motto of "Don't be evil." Times have changed, and the spirit of that motto has long since been abandoned.

2. Today, Google is the high-tech monopolist, and one of the most powerful companies on Earth, with a market value of nearly $2.5 trillion. Like Microsoft before it, Google abuses its monopoly power to dominate various technology markets in the United States and around the globe, and has caused widespread harm to competition, including by locking up distribution channels, foreclosing rivals, and reducing output, innovation, and choice.

3. For years, Google has used an arsenal of anticompetitive practices, including tying arrangements and exclusivity agreements, to maintain and extend its monopoly power. When licensing its dominant applications or "apps" (including Google Search and Google's app store, the Google Play Store) to Android mobile device manufacturers and distributors, Google conditions its license on those applications being pre-installed in prominent, undeletable locations on the device home screens; requires distributors to set Google as the exclusive default search engine for all search access points on the devices; and expressly prohibits distributors from pre-installing any non-Google search or application distribution products on Android devices. Google uses its staggering economic power to coerce distributors into these anticompetitive agreements: Google pays *billions* of dollars of its monopoly profits each year to Android distributors to secure default status for its general search engine and app store and contractually prohibits distributors from dealing with a broad range of Google's competitors.

4. The confidential agreements at the center of Google's unlawful conduct — including Google's Mobile Application Distribution Agreements (MADAs) and Revenue Share Agreements (RSAs) — and many details about their use, intent, and effects only recently became public (notwithstanding Google's acts over the years to conceal, obscure, and even delete evidence of its anticompetitive conduct). But they now have been found unlawful — and to lack any procompetitive justification — by factfinders (jury and judge) in multiple federal courts.

5. Google has abused its market power and used these exclusionary agreements across multiple technology product markets at issue in this case.

6. *First*, Google has abused its monopoly power as a general search engine to destroy competition in the market for general search services. Through exclusivity and tying arrangements, Google has locked up all search access points on the Android mobile device ecosystem, foreclosing both legacy and emerging search technologies from achieving distribution and scale. And Google has used its general search monopoly to heighten barriers to entry in search services, to unlawfully restrain trade, and to seek and obtain monopolies in related markets.

*7.* *Second*, Google has abused its monopoly power in the general search market and the distribution of Android applications (via the Google Play Store) to destroy competition in the related market for application search services. Through its exclusionary agreements, Google has foreclosed competing Android application search technologies from getting distribution with Android manufactures and wireless carriers — to such an extreme degree that Google now controls virtually the entire market for Android application search on nearly every new Android device that launches each year, and no rival technology can be integrated by Android distributors.

*8.* *Third*, Google has abused its monopoly power in Android app distribution, via the Google Play Store (from where more than 90% of Android apps are downloaded), to destroy

competition and innovation in that market. Google has created a "walled garden" for Android apps to be discovered and downloaded from its Play Store, denying consumers different and innovative ways to search, discover, and download new apps, and subjecting consumers and app developers to Google's supra-competitive charges for app downloads and purchases in the Play Store. Google unlawfully exploits its monopoly in Android app distribution to restrain trade in the markets for general and application search services, by tying its dominant Google Play Store to Google Search, requiring that distributors make Google Search the default search technology for all search access points on Android devices, and prohibiting them from using rival search products — including both general and application search technologies.

9. *Fourth*, Google has abused its monopoly power in search text advertising, via Google Search and the Google Play Store, to destroy competition, innovation, and quality in the search text ads market in the United States. Through its exclusionary agreements, Google has foreclosed competing search text advertising platforms, including rival general and application search products and app distributors, from competing in these markets for advertisers' dollars, including for search text ads. This denies rival firms critical revenue necessary to compete with Google in these markets, and reduces the number of search text advertising outlets to advertisers.

10. Branch Metrics, Inc. ("Branch"), the plaintiff in this case, developed an innovative Android application search technology called "Discovery Search" or "Discovery," which competes at the intersection of these three markets. In short, Discovery Search was designed to, and if utilized at full capacity can, effectively and extensively allow Android mobile consumers to use an integrated search bar on their device as a "one-stop shop" to access content across a broad universe of Android apps available on their device, whether already downloaded or not. Branch uses "deep-link" technology to return search results not just for an app's main page, but also for

specific content within an app — such that a search for a short-term rental property near Yellowstone, for example, would not simply produce links to the app home pages for "Vrbo," "Airbnb," "HomeAway," and other similar firms, but would return results for the specific listings within various apps, among other in-app content across other available Android apps.

11. Branch is a direct victim of Google's anticompetitive conduct. Branch's past and ongoing injuries are not the unintended or remote consequence of that unlawful conduct. To the contrary, recently unsealed documents from the U.S. Department of Justice's case against Google demonstrate that Google intentionally and specifically targeted Branch as a rival — a recognized competitive threat in multiple markets — and foreclosed Branch Discovery Search (and other rivals) from gaining distribution on past, present, and future Android mobile devices.

12. Branch brings this suit to hold Google accountable for its anticompetitive conduct; to restore and protect competition, choice, innovation, and quality; to recover for the substantial harm and damages Branch has suffered, and continues to suffer, from Google's anticompetitive conduct; and to prevent Google from continuing to engage in that unlawful conduct.

* * *

13. Historically, most consumers accessed digital content through web-based search on a desktop or, later, a laptop computer. That has changed. Virtually all consumers now receive digital information — and stay connected, informed, entertained, and make purchases — through mobile "smart" devices. With the advent of mobile devices, native applications or "apps" have become increasingly prevalent. According to Google's own research, "Apps play a major role in consumers' mobile experience," and "Apps are now an integral part of our daily micro-moments, with people spending an average of 30 hours per month in them, according to Nielsen. Apps play a key role in those I-want-to-know, I-want-to-go, I-want-to-do, I-want-to-buy moments."

14. Other consumer research shows that users now spend 90% of their time on mobile

devices in apps, with that number steadily growing. The average user accesses their mobile device approximately 80 times a day — 79 times to access content through apps and only 1 time to run a traditional web-based search. When consumers want to make travel plans, for example, they are increasingly likely to use one or more travel-related apps, rather than websites. The user experience in apps is generally considered more seamless, faster, easier, and more personalized, with user preferences and information automatically accessible and instantly loaded. Apps have become essential for companies across industries, and firms have responded to consumer demand by designing and deploying apps with broad functionality that are easy for consumers to use. As users have migrated away from the web and towards apps, the number and variety of apps has rapidly increased: Google reports that "over 3 million mobile apps are currently available for download."

15. With this shift in user digital activity to mobile devices and to app-based content (which is not built on the HTTP protocol that allows users to exchange information on the web), Branch's Discovery Search technology better aligns with consumer behavior and demand from both mobile device users and the universe of companies competing for their attention and engagement. Branch Discovery Search offers a valuable mobile search technology that, when pre-installed by Android mobile device manufacturers or wireless carriers, allows users to search for and discover content contained within a broad universe of Android mobile apps, regardless of whether those apps are already installed on those users' mobile devices.

16. Google recognizes this technology as a competitive threat in multiple respects. *First*, Discovery Search offers an alternative and enhancement to web-only searching and thus threatens to divert mobile device users (and advertisers) away from traditional web-based search, which is dominated by Google, and towards app content search. That threatens Google's core search monopoly, including its power over immensely valuable user search data. *Second*,

Discovery Search competes with Google in the application search services market, in which Google has sought to destroy all competition for the current and growing demand of users and app developers to search for in-app content. *Third*, Discovery Search threatens Google's monopoly on Android app distribution, through its Google Play Store. Google recognizes the importance of search for discovering new apps, with its own research finding that "Search is a major source for app discovery," "Search is a driver of app discovery," and "1 in 4 app users discover apps through search engines." *Fourth*, as more search technology emerges, such as Branch's application search, advertisers will have more options to spend their advertising dollars to follow shifting user demand, threatening Google's search-based and app-store advertising profits.

17. Confronted with these competitive threats, Google set out to kill Branch Discovery Search. Recently unsealed, internal Google documents reveal that when Google learned that Discovery Search was to become "standard across all of Samsung's upcoming devices," Google hatched a secret, multi-pronged scheme to "resolve" the "issue." These documents reflect that Google was not pleased, because Samsung's integration with Branch "goes beyond the scope of what [Google] originally *allowed* Samsung (and all US carriers)" (emphasis added). So Google "started pushing back on them" "to stop the functionality." The reference to what Google "originally allowed" reflects that Google had previously refused to permit Discovery Search to be implemented in-full on Samsung devices (despite Samsung's plans to do so), and had improperly insisted that Samsung implement only a scaled-back version of Discovery Search, which (among other limitations) searched only a limited number of apps, already downloaded on a user's device, and without accessing the internet or web content.

18. Google's "pushing back" against Samsung's integration with Branch was swift, comprehensive, and continues to this day. Google notified Samsung that "Samsung's partnership

with Branch expands the search experience via deep linking, violating their contracts" with Google. Next, Google amended its contracts with Samsung (and other Android distributors) to expand their anticompetitive and exclusionary reach. Determined to "stop the functionality" and ensure that Branch Discovery (and other rival search technology) would be completely foreclosed from Android mobile devices, Google amended its RSAs to expand the definition of prohibited "Alternative Search services" to cover and exclude from each new device "any web or on-device search (including on-device search that incorporates multiple vertical search functionalities) that offers functionality similar to Google Search."

19. As the United States District Court for the District of Columbia found after trial in *U.S. v. Google*, "This change resulted from Samsung's preinstallation of an on-device search technology from Branch." Memorandum Opinion at 131 (¶ 390), *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024). And Google pushed Samsung to instead integrate and promote "a Google solution," which included both Google's legacy web and budding app search products to the exclusion of Branch's competing product. *See, e.g.*, Figures 1-2.

**FIGURE 1**



**FIGURE 2**




20. For acceding to Google's exclusionary demands, Samsung would receive — and continues to receive — *billions* of dollars in revenue share from Google each year.

21. Google's anticompetitive tactics have proved effective. As a result of these and other predatory acts directed at Branch, Samsung was forced to terminate its discussions with Branch regarding Discovery Search in February 2021, advising Branch that its product would no longer be installed on any Samsung mobile devices, let alone all of them.

22. Recently unsealed, internal Samsung documents paint a vivid picture of Google's fear of competition with Branch and abuse of its monopoly power to eliminate the competitive pressure. Samsung executives described Google as "afraid" that Discovery Search on Samsung devices would "cannibalize Google's main business" (search), and thus Google "was attempting to kill all of Branch's attempts" and "all the features Branch will enable in this enhanced App Search." Google told Samsung it would not allow any "connection to the internet or servers. No connected search, not just web search," and that Samsung would have "to kill all search functionalities and products." Google further required "this to be retroactive meaning that it will

also impact devices already shipped with services and solutions already launched."

23. Samsung's executives stated that Google's restraints are going to "completely kill" and are "killing" Branch. Yet they acknowledged Samsung was likely "going to accept these terms," despite wanting to pre-install Branch Discovery Search, because "we have no more bullets to use," and "this is a case where our side can't risk not taking the money," even if it meant that Samsung would not be "optimizing the user experience."

24. These documents reflect classic predatory behavior and injury to competition — the foreclosure of a rival from a critical distribution channel — wrought by a monopolist fearful of competition and innovation. In fact, Samsung recognized it as exactly that at the time: "Google is clearly buying its way to squelch competitors." Nonetheless, Samsung's executives caved to Google's tactics, and continue to do so. For these Samsung executives realize exactly what Google knew: "Outside of a potential antitrust action, I don't see Samsung being able to refuse the money."

25. Samsung executives later recognized that not even an *actual* antitrust action from the U.S. Department of Justice would slow Google's anticompetitive march. When one Samsung employee pointed out that "GOOGL taking on the DOJ now maybe will have them less aggressive in strict interpretations of contracts? So maybe that helps in terms of timing to push Branch," a Samsung executive responded, "Actually the COMPELTE opposite . . . . After the doj filings, they submitted a new redline that went backwards in all negotiations with Samsung and was even more aggressive in being restrictive." The message was clear: Google would not be restrained, would continue its exclusionary conduct, and Samsung best fall in line.

26. Though Samsung's executives wistfully speculated that Branch might have "better luck with other OEMs [original equipment manufacturers] who don't receive rev share from Google," they did not account for the reach of Google's predatory conduct. Google has entered

into RSAs with *all* of the major OEMs and wireless carriers, who must certify compliance with Google's RSA for every new device they distribute each year. Carriers distribute the vast majority of Android devices, so Google is keenly focused on foreclosing that distribution channel as well.

27. Google employees had learned from AT&T that "'Samsung informed us that the feature has been turned on in the finder app on Samsung devices sold by [T-Mobile], Verizon, and Sprint and that it wants to make the functionality standard across all of Samsung's devices — including those distributed by AT&T," and that "AT&T is considering working directly with Branch, ideally standardizing and bettering the user experience across various OEMs, and to return more relevant results." Given its growing concern that Branch had "created an alternative [search] access point," Google executives immediately moved up the distribution chain from Samsung to "US carriers," and "started pushing back on them" distributing Branch Discovery Search.

28. In fact, the same internal documents outlining Google's plans against Samsung's use of Discovery Search reflect Google's intent to simultaneously coerce U.S. and Canadian carriers, including Verizon, Sprint, T-Mobile, and AT&T, to continually foreclose Branch Discovery Search from Android distribution. Google set out to "confirm that other carriers have language (they should) that gives us ability to ask them to discontinue this practice," and Google employees were assigned to "work with them on removing this functionality."

29. As with Samsung, Google's dominance and monopoly profits have also ensured the success of its illegal scheme to destroy competition and foreclose Discovery Search from Android devices distributed on the AT&T wireless network. As one AT&T executive testified under oath in recently disclosed testimony, despite AT&T's interest in distributing Discovery Search, AT&T worried about "risks associated with" partnering with Branch because it could be "considered a competing or alternative search," and thus violate its RSA with Google, which

would require AT&T to "forego[] the Internet search revenue from Google and instead just earn[] this on-device search revenue from Branch." Thus, as the D.C. District Court found, AT&T has decided not to proceed with integrating Branch Discovery Search based on its anticompetitive agreements with Google. *See* Memorandum Opinion at 132-33 (¶¶ 395-96), *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024).

30. Nor has Google stopped at Samsung and AT&T. As one Google executive summarized in a confidential internal email: "In summary, we will be pushing all US carriers to clearly meet the *Alternative Search Services* requirement." Eventually, Google worked to foreclose Branch Discovery Search — and any other non-Google application search technology — through every MADA and RSA it has executed for the Android ecosystem, with OEMs and carriers alike.

31. Google's anticompetitive conduct has substantially harmed Branch and its Discovery Search product. Branch is left with no ability to gain distribution and scale, has lost and continues to lose substantial profits, and its enterprise value is substantially diminished. At the same time, hundreds of millions of consumers continue to be denied competition, output, innovation, and quality in the markets for application search services, general search services, Android app distribution, and search advertising. Killing Discovery Search also serves Google's self-reinforcing goals to harm its other search engine, application search, and app distribution competitors, heighten the barriers to entry in these markets, and ensure Google's walled garden will remain dominant for years to come.

32. By foreclosing Branch Discovery Search (and other rivals), Google eliminates competition for integrated application search services on Android. Although Google's application search functionality is inferior to Branch's, Google is trying to be the only game in town for integrated application search functionality on Android mobile devices. And Google recognizes the

demand for this functionality.

33. For example, Google now touts its app search functionality to app providers as a way of getting consumers to find their apps: "Google can crawl through your app content and present your Android app as a destination to users through Google Search results." Google also has stated, "Another way to help people find what they're looking for is by adding deep links to your ads. This way, the mobile app engagement ad links to the most relevant parts of your app. Take that shopping app we just mentioned, for example. A deep link could bring that marathoner directly to listings inside the app for running shoes for women." This, of course, is exactly the functionality that Branch Discovery Search would provide on all Android phones, through Samsung and other OEMs and wireless carriers, but-for Google's anticompetitive conduct.

* * *

34. Google's practices are unlawful under Section 1 and Section 2 of the Sherman Act, Section 15 of the Clayton Act, and violate state competition and common law. Branch seeks to recover the damages it has suffered because of Google's antitrust violations, as well as equitable relief to enjoin Google from enforcing its anticompetitive agreements.

## PARTIES

35. Plaintiff Branch Metrics, Inc. is a Delaware corporation with its corporate headquarters and principal place of business in Mountain View, California. Branch has offices in Texas, throughout the United States, and around the globe.

36. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of Delaware. Google has offices in Texas, throughout the United States, and around the globe.

## JURISDICTION AND VENUE

37. This action arises under the federal antitrust laws — Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 — and certain state law causes of action.

38. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which vests federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1337, which vests federal district courts with "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

39. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so closely related to the federal claims that they form part of the same case or controversy.

40. This Court has personal jurisdiction over Google because Google has committed acts within Texas and this District giving rise to this action and has established minimum contacts with Texas and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. The anticompetitive conduct alleged in this Complaint was effectuated at least in part by Google employees within Texas, including through Google's relationship with suppliers and distributors based in Texas and this District, through which Google restrains competition in Texas and this District, and affects consumers and other market participants in Texas and this District. Google also conducts substantial and relevant business in Texas and this District, has established sufficient contacts in this State and District, offers the products and services at issue in this action in this State and District, has harmed consumers in this State and District, and has benefited from transacting business in this State and District, such that

such personal jurisdiction is appropriate. Google provides a range of products and services that are marketed, distributed, and offered to consumers, manufacturers, distributors, and service providers throughout the United States, the State of Texas, this District, across state lines, and internationally.

41. Venue is proper in this District, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Section 22 of the Sherman Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because Google is found and transacts business in this District, including through Google Search and the Google Play Store, each of which operate in this District, and through its anticompetitive agreements and practices described throughout this Complaint, all of which apply to Android mobile devices distributed in this District and have caused anticompetitive effects in this District.

## FACTUAL ALLEGATIONS

### I. PLAINTIFF BRANCH AND BRANCH DISCOVERY SEARCH

42. Branch is a software company that provides the industry's leading deep linking and mobile attribution platforms, unifying user experience and attribution across devices, platforms, and channels. Founded in 2014, Branch has more than 2,000 technology partners, more than 100,000 app developer customers — from startups to Fortune 500 brands — and over 3 billion monthly active users. Branch has raised more than $667 million from investors around the globe.

43. Deep linking is technology that guides users from a link directly to specific content inside an application. Just as a normal web link guides a user to a specific page on a website, a mobile or app deep link guides a user directly to a particular section or functionality within an app. This is true even if the user has not already downloaded that app on their mobile device. In such circumstances, so-called "deferred" deep linking can detect if a user needs to install the app, route the user to download the app, and once that app is downloaded and installed, open the app content the user was attempting to reach. These deferred deep links bridge the gap and ensure a seamless transition from discovery to content access.

44. Mobile deep linking transforms user engagement by directly connecting users to specific app content, enhancing user experiences, and facilitating desired interactions to the benefit of users and brands alike. For example, by directing users to targeted in-app content from external sources, deep linking leads to higher user engagement and satisfaction, increases app discoverability, boosts user downloads and acquisition rates, increases the likelihood of conversions, and increases user retention while also reducing churn rates. By providing a smooth transition between apps, deep links also help users break out of walled gardens like internet browsers or social media platforms — for example, a deep link can take a user directly from an influencer's social media post to a specific page within a brand's shopping app with a single click.

45. Branch's "Discovery Search" or "Discovery" product builds on Branch's successful deep linking technology by providing a mobile search technology that, if pre-installed by OEMs or wireless carriers ("carriers") (collectively, "device distributors" or "distributors"), allows end users to search for and discover content contained within apps, regardless of whether those apps are already installed on the user's mobile device. This technology aligns with the shift in consumer digital activity to mobile devices and app content that does not reside on the web — one study from eMarketer found that users now spend 90% of their time (and growing) in apps; another found that the average user accesses their device approximately 80 times a day, 79 of which are to access content through apps. Thus, Discovery Search offers alternatives to web-only searching and app discovery through Android app stores, both of which are dominated by Google.

46. Discovery Search is integrated into a user's mobile device and provides an on-device search access point for users — for example, through a swipe-up or pull-down search bar on each device home screen into which users can input search queries. Discovery Search works by running user search queries across deep-linked, indexed content from mobile apps — both those

installed on the user's device and those available for download. Discovery Search returns relevant search results that direct users to specific content within one or more of those apps. When a user clicks on a result, Discovery Search directs the user to the specified content in that app; if the specified content is contained in an application not installed on the user's device, Discovery Search first directs the user to a location at which that app may be downloaded and installed and, then, re-directs the user to the app content that was returned in the Discovery Search results.

47. As Google's employees summarized in secret, internal emails, Branch Discovery Search provides "an alternative search access point" and "search experience across multiple apps through deep linking. So for example now when you look for 'pizza', it will show you Yelp recommendations for restaurants, or if you look for 'shoe' it will show you recommendations from Amazon or Ebay." In another, similar example, Google employees explained that Discovery Search conducts "off-device (web) search across multiple apps . . . when we search for 'pizza' we see results from Netflix, Pinterest, Yelp, Galaxy Store, Play store, other 3rd party apps etc."

48. For example, as illustrated below in Figure 3, if a user were to search "deliver mexican food san francisco" in the Discovery Search access point integrated into an Android device like the Samsung Galaxy S10, such a search might return results from food delivery apps like Caviar, DoorDash, and Postmates, depending on that user's preferences. For the user on the left — who prefers Caviar but occasionally uses DoorDash — his search results are prioritized from Caviar, then DoorDash, and finally, Postmates, which is an app that he has not installed on his device. For the user on the right — who prefers Postmates but occasionally uses Caviar — her search results are prioritized from Postmates, then Caviar, and finally, DoorDash, which is an app that she has not installed on her device. For any apps already installed on the user's device, clicking on a particular search result would direct the user to that specific content within that app — such

as the Papalote menu in the Caviar app on the device on the left, or the Colibri menu in either Postmates or Caviar apps on the device on the right. Further, based on their different preferences, the user on the left would see results for El Faro, while the user on the right would see results for Los Hermanos. Each user may also see results for new apps — whether Postmates or DoorDash in these examples — which could direct them to additional relevant content for Mexican food delivery in San Francisco after the users download and install these new but relevant apps.

**FIGURE 3**




49. In addition to the benefits it provides to end users, Discovery Search also benefits app developers and advertisers. It provides them an additional search access point and real estate integrated into the Android mobile device, through which they can reach end users who in turn can discover and engage with their apps and brands through the Branch Discovery Ads program.

50. For example, using Branch's in-house ad technology infrastructure, app developers and advertisers can offer install and reengagement campaigns served by paid search advertising, including text ads, and zero state (*i.e.*, in the pre-search state of the device) interactive ads through Branch Discovery Search (see Figure 4 below). Application developers and advertisers also can

select where end users are directed to download and install new apps, such as through direct downloading or by routing the user through one or more app stores.

**FIGURE 4**




51. Google's anticompetitive conduct has foreclosed Branch Discovery Search from being integrated, in whole or part, on billions of Android devices distributed around the globe, including those distributed by Samsung and the major carriers in the United States and abroad.

52. In short, Branch has suffered and continues to suffer injury-in-fact proximately caused by Google's illegal conduct. For example, Google's conduct has illegally excluded and continues to exclude Branch from the relevant markets, including by precluding Android OEMs and carriers from installing or promoting Branch Discovery Search on Android devices distributed

around the globe. Google's ongoing intentional scheme to "stop the functionality" of Discovery Search has caused specific and intentional harm to Branch's business and property, including by denying Branch the business, sales, distribution, revenues, and profits that Discovery Search would achieve through monetizing these distribution channels but-for Google's illegal conduct, and by the diminution in value of Branch's business.

53. These injuries include lost domestic and foreign business, sales, distribution, revenues, and profits. Google's anticompetitive conduct was hatched in the United States by an American company and injured competition and Branch both with respect to domestic and foreign commerce. And Google's conduct continues to have a direct, substantial, and reasonably foreseeable effect on United States commerce, foreign commerce, and export commerce.

## II. RELEVANT MARKETS

### A. Android Application Search Services

#### i. Android Application Search Services Worldwide (Excluding China) Is a Relevant Antitrust Market

54. Android application search services worldwide, excluding China, is a relevant antitrust market. Application search services allow consumers to find responsive information in mobile applications by entering keyword queries in an application search service, such as Branch Discovery Search and Google Search.

55. Mobile device users now spend over 90% of their internet time in apps. According to Google's own research, "Apps are now an integral part of our daily micro-moments, with people spending an average of 30 hours per month in them, according to Nielsen. Apps play a key role in those I-want-to-know, I-want-to-go, I-want-to-do, I-want-to-buy moments." Google reports that "over 3 million mobile apps are currently available for download," and "Apps play a major role in consumers' mobile experience."

56. Application search services are thus unique because they are tailored to the demand for app content and offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across a broad universe of apps available on their device, whether already downloaded or not. Consumers can use application search services to perform several types of searches, including navigational queries (seeking a specific app), informational queries (seeking knowledge or answers to question), and commercial queries (seeking to make a purchase). The ability of consumers to search in and across app content through a single search provides unique value to mobile users. For this reason, an Android mobile device user would not regard the search function *within* a single app as a reasonable substitute for application search services that search for and return relevant content across a broad universe of applications.

57. Offline and online resources, such as books, publisher websites, social media platforms, and specialized search providers such as Amazon, Expedia, and Yelp, do not offer consumers the same breadth of information or convenience and hence are not reasonable substitutes for application search services. These resources are not "one-stop shops" and cannot respond to all types of consumer app queries. Few consumers would find these alternative sources a suitable substitute for application search services. A consumer searching for running shoes on the Amazon website or app, for example, will receive results showing only the running shoes available for purchase on Amazon; by contrast, a consumer searching for running shoes in an application search service can get results with relevant content from across a broad universe of available apps, including apps of running shoe companies, apps for various retailers selling running shoes (such as the Amazon app), consumer review apps, running-focused apps, exercise related apps, and more. Thus, there are no reasonable substitutes for application search services, and an application search service monopolist would be able to maintain quality below the level that would

prevail in a competitive market.

58. General search engines that do not provide Android in-app content in response to search queries are not perfect substitutes for Android application search services. Some general search engines, like Google Search, however, do provide Android in-application content in response to search queries and thus compete in the Android application search services market. Google touts its application search functionality, including in marketing to app providers: "Google can crawl through your app content and present your Android app as a destination to users through Google Search results," and "Another way to help people find what they're looking for is by adding deep links to your ads. This way, the mobile app engagement ad links to the most relevant parts of your app. Take that shopping app we just mentioned, for example. A deep link could bring that marathoner directly to listings inside the app for running shoes for women."

59. The relevant market does not include application search technology for non-Android operating systems, such as Apple's iOS. *First*, apps developed for the Android operating system cannot function on Apple iOS devices, and vice versa, and not all apps are developed for both platforms. A consumer who has a mobile device running the Android operating system thus cannot use apps created for a different mobile operating system and does not have a need to search or find them. Android app stores also distribute only Android-compatible mobile apps. The consumer may not substitute an Android app store with, for example, Apple's App Store because that app store is not available on Android devices, is not compatible with Android OS, and does not offer apps that are compatible with the Android OS. *Second*, the deep links that enable search and presentation of in-app content on Android and iOS devices are built and operate on different platforms: Android uses App Links to take users to Android apps and requires integration with Android OS and the apps manifest file; iOS instead uses Universal Links. Android and iOS deep

linking also use different URL formats, handle links differently, and have different standards. Thus, Android application search technology is not reasonably interchangeable with application search technology designed for other OS, such as iOS.

60. Consequently, a monopolist Android application search firm is not constrained from raising prices, or reducing quality or innovation, by application search technology on Apple iOS devices, other mobile devices that use an alternative to Android, or desktop devices, due to other market imperfections, such as high switching and information costs. A consumer would be unlikely to switch to another mobile operating system in response to small changes in quality or price in Android application search. A consumer would lose his or her financial investment in the previously purchased mobile device, as well as data on that device and digital content consumable only through Android apps, and would need to purchase a new device. In addition, different mobile operating systems have distinct designs, controls, and functions that consumers learn to navigate and become familiar with over time. These and other switching costs deter most consumers from switching. Thus, OEMs would not have any incentive to switch to another licensable mobile OS (of which there are a limited number) because consumers would be unlikely to switch.

61. The relevant geographic market for application search services is worldwide in scope, excluding China. Geographic barriers to entry are low in most regions of the world, and there are no significant limitations that would prevent an app search service from being made available on a worldwide basis. Application search service developers often make such technology available in many countries, users get application search services and apps from developers who operate in different countries, and app developers often choose to distribute their apps globally (and can do as much through the Google Play Store, for example, by agreeing to do so through their distribution agreements with Google and/or ticking a box in the distribution section of the

Play Store). Device distributors also distribute similarly equipped devices around the world and desire to make the features and functionality of those devices parallel around the world.

62. Conditions of competition are different in China, however, where Google's activities are severely limited. For example, Google's products are not available in China. In addition, many OEMs use a heavily customized (and "forked") version of Android for devices that are sold in China. By contrast, OEMs that sell outside of China have entered into licensing agreements with Google that cover all devices sold outside of China.

**ii. Google Has Monopoly Power in Android Application Search Services Worldwide (Excluding China)**

63. Google dominates the Android application search services market. By virtue of its exclusionary conduct, Google has effectively foreclosed all Android application search competitors from getting distribution with OEMs and carriers (including AT&T, Verizon, and T-Mobile). Google thus has a dominant share of this market, exceeding 50% at minimum, and likely significantly higher (90 to 100%).

64. Google has achieved this dominant market share through its anticompetitive and exclusionary practices as alleged below. Google's ability to foreclose rivals and exclude competition is direct evidence of Google's monopoly power.

**iii. Branch Participates and Competes with Google in the Market for Android Application Search Services Worldwide (Excluding China)**

65. Branch Discovery Search competes in the market for Android application search services, including with Google's own products that search and return results of deep-linked apps and app content across multiple verticals in response to user queries — such as Google Search.

66. Google's anticompetitive conduct is directed at Branch's competition in this market. Google has expressly targeted Branch because it threatens Google's market dominance. Google wants to prevent Discovery Search, specifically, from expanding the mobile search

experience through integrated in-app searching and thus is acting to exclude Branch from this market by coercing distributors not to deal with Branch or distribute its Discovery Search product.

67. Google recognizes Discovery Search as a competitor for a "search experience across multiple apps through deep linking," including when Google pushed its own "Google solution" and "similar experience" at the same time it forced Android distributors to "stop the functionality" provided by Branch.

68. Google is not alone in recognizing Branch Discovery Search as a competitor to Google in the Android application search services market. For example, in internal emails, Samsung executives have discussed how in prior negotiations Google had "carved out" "[B]ranch in app content search," but "[t]he current agreement is looking like google will own all search on device." As these Samsung executives summarized, "This will completely kill all potential for any [B]ranch search and other future services." Another executive similarly remarked that Google's position as to Branch was "no connected search, not just web search" and that Google wants to "kill" "all the features Branch will enable in this enhanced App Search."

69. Consistent with this industry recognition, Branch is a competitor in the Android application search services market. Branch's intention to enter this market at greater scale, but-for Google's anticompetitive conduct, is demonstrated by, for example, the contemporaneous statements to that end on its website, press releases, and public interviews, as well as by the contracts and relationships it had built with Android OEMs and carriers. In fact, Branch has not just attempted to provide Android application search services, but actually has succeeded in doing so, albeit on a smaller scale, with narrower distribution, and in more limited integrations than it would but-for Google's anticompetitive conduct.

70. Moreover, Branch's ability to compete in the market for Android application search

services but-for Google's exclusionary conduct is demonstrated by, for example, Branch's ability to finance its business and purchase the necessary facilities and equipment (such as raising more than $667 million from investors; building out its deep-linking, advertising, and application search infrastructure; and opening offices around the globe), Branch's consummation of contracts (such as with OEMs, app developers, and advertisers), other affirmative actions by Branch to enter the application-search business (such as developing relevant software and tools; marketing its services to OEMs, carriers, app developers, and advertisers; and launching on certain devices, OEMs, and networks), and by the relevant background and experience of Branch's employees (including top software and search engineers, business executives, and employees with deep ties to OEMs, carriers, app developers, and advertisers). Thus, but-for Google's anticompetitive conduct to exclude Branch and capture the application search market, Branch has the resources — including the technology, skill, capital, and relationships — to compete and win business in the application search services market.

## B. General Search Services

### i. <u>General Search Services in the U.S. Is a Relevant Antitrust Market</u>

71. General search services in the United States is a relevant antitrust product market. General search services allow consumers to find responsive information on the internet by entering keyword queries in a general search engine such as Google, Bing, or DuckDuckGo.

72. General search services offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet. Consumers use general search services to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase).

73. Offline and online resources, such as books, publisher websites, social media

platforms, and specialized search providers such as Amazon, Expedia, and Yelp, do not offer consumers the same breadth of information or convenience and thus are not reasonable substitutes for general search engines. These resources are not "one-stop shops," and cannot respond to all types of consumer queries, particularly navigational queries. Few consumers would find these alternative sources a suitable substitute for general search services.

74. Application search services, such as Branch Discovery Search, provide partial substitution for general search services. Google recognizes the competitive pressure on its general search engine business from Discovery Search and has thus specifically endeavored to prevent it from getting distribution. At the same time, application search services are not perfect substitutes for general search services, given the differences in their respective universes of content, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

75. Following trial in *U.S. v. Google*, the District of Columbia issued findings of fact and conclusions of law holding that "[t]he evidence at trial established that general search services is a relevant product market and alternative sources for query information, like SVPs and social media sites, are not adequate substitutes." Memorandum Opinion at 144, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024); *see also id.* at 144-51.

76. The United States is a relevant geographic market for general search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes for general search services offered in the United States. Google analyzes search market shares by country, including the United States.

### ii. Google Has Monopoly Power in the U.S. General Search Services Market

77. Google has monopoly power in the United States general search services market. There currently are only four meaningful general search engines in this market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data, Google dominates the market with approximately 88% market share, followed far behind by Bing with about 7%, Yahoo! with less than 4%, and DuckDuckGo with less than 2%.

78. Following trial in *U.S. v. Google*, the District of Columbia issued findings of fact and conclusions of law holding, "[t]he structural approach — a dominant market share fortified by barriers to entry — easily establishes Google's monopoly power in search," and thus "Google has monopoly power in the general search services market." Memorandum Opinion at 154, 165, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024); *id.* at 152-65.

79. Google has steadily increased its dominant position in the general search services market. In July 2007, Google estimated its general search services market share at 68%. By June 2013, Google estimated that its share in the United States had increased to 77% on computers. By April 2018, Google estimated that its share was 79% on computers and 93.5% on mobile. More recently, Google has accounted for almost 90% of all general search engine queries in the United States, and almost 95% of queries on mobile devices.

80. Following trial in *U.S. v. Google*, the District of Columbia issued findings of fact and conclusions of law holding, "Plaintiffs have easily demonstrated that Google possesses a dominant market share. Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices . . . . Google does not contest these figures." Memorandum Opinion at 156-57, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024).

81. There are significant barriers to entry in the general search services market. The creation, maintenance, and growth of a general search engine requires significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms — Google and Microsoft — maintain a comprehensive search index, which is just a single, albeit fundamental, component of a general search engine.

82. Scale also is a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience. The scale needed to successfully compete today is greater than ever. Google's anticompetitive conduct, as detailed in this Complaint, continues to effectively eliminate rivals' ability to build the scale necessary to compete.

83. Google's large and durable market share and the significant barriers to entry in the general search services market demonstrate Google's monopoly power in the United States.

84. Following trial in *U.S. v. Google*, the District of Columbia issued findings of fact and conclusions of law holding, "(1) high capital costs, (2) Google's control of key distribution channels, (3) brand recognition, and (4) scale" exist as "barriers to entry" and "that, both individually and collectively, they are significant barriers that protect Google's market dominance in general search." Memorandum Opinion at 157, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024); *id.* at 157-65.

**iii. <u>Branch, Google, and Others Perceive Branch as a Competitor and Potential Substitute for General Search Services in the U.S.</u>**

85. Branch, Google, and other market participants perceive Discovery Search as a competitor in the general search services market in the United States, including as a direct competitive threat to Google Search on mobile devices. In fact, Branch was founded on an intent and belief that Discovery Search can provide an innovative new paradigm for mobile search — and Branch was and is prepared to do just that but-for Google's ongoing anticompetitive conduct.

86. Google recognizes Branch as a competitor to Google Search when Google specifically precludes Discovery Search from the Android ecosystem by withholding revenue share for any new (or old) Android device that incorporates Discovery Search, pursuant to "search rev share deals" that preclude any "alternative search service" that, for example, is "substantially similar to Google Search" or that offers "functionality that is similar to Google Search." Notably, although Google also broadened its exclusionary "alternative search service" definition to cover this threat posed by Branch Discovery Search, this is the exact same provision from Google's RSAs that Google uses to preclude and maintain exclusivity over its general search engine competitors, like Bing. As these until-recently secret (and still heavily redacted) emails show, Google's express concern is that Discovery Search has "created an alternative access point" and "generic search box" that conducts "off-device (web) search . . . which conflicts with our definition of the Alternative Search," and therefore Discovery Search could "impact internet searches." Google thus continues to preclude Discovery Search so that Google Search "shall be the default for all search access points."

87. Google also is expressly focused on Branch's web search functionality. In particular, Branch Discovery had once been configured with a fallback to website functionality such that, if users did not yet have the app containing the content returned in their search results installed on their device, app developers could decide whether the users should be directed to those developers' websites or to an app store to download their apps before being redirected to the in-app content returned in Discovery Search. Google perceives this functionality as a competitive problem: returning relevant website content directly competes with Google Search's primary offering of website results. So much so that, after members of the Google corporate development and mobile search teams met with Branch executives in 2015, Google subsequently re-configured

Google Search and its related product offerings to directly compete with Discovery Search's technology by also providing developers and advertisers the options of sending Google Search users either to in-app content or to their websites. After co-opting Branch's competing technology in Google Search, Google is using the anticompetitive acts alleged here to ensure no OEM or carrier installs or promotes Branch Discovery Search.

88. Moreover, in the same confidential emails in which Google worked to first exclude Branch, the Google employees compared Discovery Search to search queries and search results in multiple legacy/general search access points (such as the app drawer search box) and sought to confirm with the Google Search team that "Google Search [could] do something similar to this, and we can pivot the conversation with Samsung and carriers from asking them to take it down, to seeing if Google could power this experience."

89. Google is not alone in recognizing that, but-for Google's anticompetitive conduct, Discovery Search would be a competitive threat to Google Search. For example, an internal T-Mobile document remarks that, although T-Mobile has contracted for years "with Google to provide Google Search services on T-Mobile's owned and operated properties" and that Google Search services "has been a good source of cash for us, we have absolutely no control over the customer experience or monetization." In looking for alternatives to allow T-Mobile "to fully control and manage the customer experience, as well as monetization," T-Mobile has considered a new solution with a combination of "search engines" such as "Branch."

90. As another example, despite Samsung's demonstrated interest and specific desire to integrate Discovery Search, Samsung has explained that "the gating factor here is the Google-Samsung contract terms and anything that can be claimed by Google as 'web search' is something we need to avoid." Still another Samsung email stated that Google was "afraid" that Discovery

Search would "cannibalize Google's main business" (search), and recognized, "Google is clearly buying it's [sic] way to squelch competitors."

91. As another example, AT&T has told Branch that AT&T needs to ensure that Discovery Search "would NOT infringe on our Google Search Requirements." In secret communications with AT&T, Google has taken the position that AT&T implementing Discovery Search would violate its RSAs, including for implementing a technology "similar to Google Search." As an AT&T executive testified, AT&T has complied with Google's dictates based on its fear that implementing Discovery Search "potentially put at risk a device not being eligible for our Google Search revenue."

92. Indeed, Google has moved against Branch because of Google's express concern that Discovery Search "created an alternative access point" set to become "standard across all of Samsung's upcoming devices," and was drawing interest from other OEMs and dominant carriers in the U.S. and Canada, including Verizon, Sprint, T-Mobile, and AT&T. In direct response to Branch's early traction, product launches, distribution deals, innovation, and rapidly expanding threat to Google's dominance, Google has moved to "stop," "push[] back on," "discontinue," and "remov[e] this functionality" from the Android ecosystem.

93. Google thus perceives Discovery Search as a competitive threat with the potential to develop into a viable platform substitute for general search services — including because Discovery Search likewise allows consumers to find responsive information on the internet by entering keywords into a search bar on a mobile device.

94. Google's recognition of Discovery Search as a competitive threat is rational. Like Google Search, if integrated and fully implemented on Android devices, Branch Discovery Search can (a) provide a search access point on a mobile device that can be accessed through a generic

search box, such as by pulling down or swiping up on the device; (b) offer a "one-stop shop" to access an extremely large and diverse volume of information; (c) be used by consumers to perform several types of searches, including navigational queries, informational queries, and commercial queries, at all levels of the search funnel; (d) search across multiple verticals; (e) be used by consumers to discover new and relevant apps; (f) serve results based on user preferences; (g) return results from and direct users to both deep-linked app content and websites; and (h) provide a platform for advertisers to serve mobile ads, including search ads.

95. Moreover, Discovery Search's ability to return information in response to user queries from searching deep-linked apps presents a major competitive threat to Google, as online behavior has shifted to apps. This technological innovation from Branch poses a competitive threat to Google search not only because it provides more relevant results and a better user experience, but also because consumers are increasingly mobile, and the mobile ecosystem was built in the age of platforms and apps that are not built on the HTTP protocol already indexed by Google.

96. For example, mobile usage passed desktop usage in 2016; and on mobile, app usage far outpaces web usage. One study reports that mobile users spend nearly 90% of their time in apps rather than on the web. Another study reports that Americans check their phones 80 times per day but only search Google from their mobile device 1 time per day. Yet another study reports that, as of 2020, more than 70% of all ecommerce was conducted on a mobile device, a percentage that is growing each year. Further, many of the world's most popular apps and brands primarily function without a dedicated website, including Uber, Instagram, Spotify, and most mobile games. User engagement and conversion rates also are much higher in apps than on the web.

97. As a result, as consumers spend more of their time on apps rather than the web, the answers to their search queries will be more relevant if served from in-app content than from web

content, and more relevant results will beget more searching via Branch Discovery Search than via Google Search. Discovery Search also poses a threat to Google Search's monopoly profits because, but-for Google's anticompetitive conduct, advertisers will have another better, cheaper, and non-Google platform on which to reach mobile device users, and OEMs and carriers can choose to integrate a mobile search experience based on factors like quality, innovation, and user and advertiser preference — rather than based on coercion, exclusionary contracts, and bounties.

98. But for Google's anticompetitive conduct, Discovery Search also serves to lower barriers to entry in the general search services market. For example, by innovating the mobile search experience to return results based on deep-linked app content, rather than indexed web content, Discovery Search provides a technology that decreases the otherwise high capital costs needed to enter the general search services market. Whereas other market participants have testified under oath that mobile search is a "no fly zone" for venture capitalists and requires multiple billions of dollars to compete, Branch's innovations attracted hundreds of millions of dollars of investments, enabling Discovery Search to develop into a substantial competitive threat that Google acts specifically to foreclose.

99. Google's anticompetitive conduct against Branch also thwarts Discovery Search's ability to lower the Google-erected barriers to entry, including Google's self-reinforcing advantages of scale and its ability to use monopoly profits to maintain its search monopoly. Absent Google's anticompetitive conduct, Discovery Search will divert Google search traffic and impair Google Search advertising revenues, each of which otherwise helps Google maintain its illegal monopoly and thwarts entry and competition from other search technologies, including general search engines. By providing another search access point that improves rather than detracts from the look and the feel of the device and the user experience, Branch Discovery Search is uniquely

positioned to divert a substantial share of search traffic and ad revenues from Google Search's default search access points obtained through Google's MADAs and RSAs without also diverting such traffic from Google's general search engine competitors. Thus, but-for Google thwarting Branch's innovation, Discovery Search would deny Google Search additional search data (and associated network effects) and reduce Google's search revenues, which Google uses to directly harm both Branch and its general search engine competitors.

100. In the absence of Google's anticompetitive conduct, Discovery Search also would lower barriers to entry to the general search services market and enhance competition by providing a technology that removes the need for OEMs and carriers to pre-install the Google Play Store for apps on their devices. By enabling apps to be searched, discovered, and downloaded outside of the Play Store, Discovery Search counteracts Google's anticompetitive contracts that are a barrier to entry and enhances competition in the general search services market. Google's own documents admit as much — explaining that alternative app distribution products could create a "contagion risk" in which OEMs (including Samsung) and carriers "no longer need the Play store for Apps on their phones, which would then weaken the leverage that MADA provides," and "[w]ithout MADA, we would not be able to incentivize placement of the [Search] Widget, which drives [redacted] of search revenue on a device and secures other 1P apps like Chrome and Assistant."

**C. Android App Distribution**

**i. Android App Distribution Worldwide (Excluding China) Is a Relevant Antitrust Market**

101. Android app distribution worldwide, excluding China, is a relevant antitrust product market. This is the market in which consumers may obtain apps for use on Android mobile devices that meet their specific needs and preferences. Android app distribution includes all channels by which Android apps on mobile devices may be distributed to consumers, such as

through the dominant Google Play store, through smaller app stores such as those maintained by Samsung, Amazon, and Aptoide, and through direct downloading of apps by consumers without using an app store, which Google terms "sideloading."

102. App stores allow consumers to easily browse, search for, access reviews on, purchase, download, and install mobile apps, using the mobile device itself and an internet connection. Distributors find it commercially unreasonable to ship a mobile device to a consumer without at least one app store installed because a consumer's ability to obtain new mobile apps is an important part of the value provided by mobile devices.

103. Other app markets are not reasonable substitutes for Android app distribution. Software applications for personal computers or gaming consoles cannot be installed or used on Android devices, and thus the distribution of software applications for personal computers and gaming consoles — such as on a developer's website or stores on websites such as Amazon, Microsoft, or Steam — does not provide a substitute for the distribution of Android apps.

104. The Android app distribution market also does not include the distribution of mobile apps that are compatible with other, non-Android OS, such as Apple's iOS. For example, the Google Play Store and the Apple App Store do not compete directly, because they and the apps they distribute function with only one mobile OS and cannot work on an incompatible mobile device. A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile OS. Android app stores distribute only Android-compatible mobile apps. The consumer may not substitute an Android app store with, for example, Apple's App Store because that app store is not available on Android devices, is not compatible with Android OS, and does not offer apps that are compatible with Android OS.

105. As the Majority Staff of the Subcommittee on Antitrust, Commercial and

Administrative Law of the House Committee on the Judiciary concluded in its October 2020 report, "Investigation of Competition in Digital Markets": "Apps are not interoperable between operating systems — native apps developed for [Apple's] iOS only work on iOS devices, and native apps developed for Android only work on Android devices. The [Apple] App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa." That is true even if an app is available for different types of platforms running a different OS because only the OS-compatible version of that app can run on a specific type of device or computer. A monopolist app distributor on Android devices, moreover, is not constrained from raising prices, or reducing quality or innovation, by app distribution on iOS devices (or any other mobile or desktop device that uses an alternative OS to Android), due to other market imperfections, such as high switching and information costs.

106. A consumer would be unlikely to switch to another OS in response to a small price increase (or a small reduction in quality) in Android app distribution. A consumer would lose his or her financial investment in the previously purchased mobile device, as well as data on that device and digital content consumable only through Android apps. In addition, different mobile OS have distinct designs, controls, and functions that consumers learn to navigate and become familiar with over time. These and other switching costs deter most consumers from switching. Thus, OEMs would not have any incentive to switch to another licensable mobile OS (of which there are a limited number) because consumers would be unlikely to switch.

107. The relevant geographic market for Android app distribution is worldwide, excluding China. Geographic barriers to entry are low in most regions of the world, and there are no significant limitations that would prevent other Android app stores or direct downloading of

Android apps to occur on a worldwide basis (except in China). App stores often are accessible in different countries around the world, direct downloading is not geographically limited, users get apps from developers who operate in different countries, and app developers often choose to distribute their apps globally (and can do as much through the Google Play Store, for example, by agreeing to do so through their distribution agreements with Google and/or ticking a box in the distribution section of the Google Play Store). Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores such as the Play Store, available on Android devices on a worldwide basis (except in China). China is excluded from the relevant geographic market because legal and regulatory barriers prevent the operation of many app stores, including the Play Store, within China. And app stores that are prevalent in China are not available, or have little presence, outside of China — for example, Myapp, 360 Mobile Assistant, Baidu Mobile Assistant, MIUI app store, and Wandoujia.

108. Following trial in *In re Google Play Store Antitrust Litigation*, a jury in the Northern District of California found that the Android app distribution market worldwide excluding China is a relevant antitrust market. *See* Verdict Form at 1-2, *In re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD, ECF No. 606 (N.D. Cal. Dec. 11, 2023). That District Court further held that "the evidence at trial demonstrated that the markets for Android app distribution and in-app payment systems are different from the markets for Apple/iOS app distribution and in-app payment systems." Order at 9, *In re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD, ECF No. 674 (N.D. Cal. July 3, 2024).

**ii. <u>Google Has Monopoly Power in Android App Distribution Worldwide (Excluding China)</u>**

109. Google has monopoly power in the Android app distribution market worldwide, excluding China. More than 90% of apps on Android devices are downloaded from the Google

Play Store. A 2017 internal Google report confirmed that the "Play Store dominated in all countries." Another Google report stated that off-Play Store installations (including from direct downloads and competing app stores) amounted to only 4.4% of Android app downloads in the United States. A June 2022 report released by the United Kingdom Competition and Markets Authority similarly found that the Play Store is the main app store used by consumers in the United Kingdom, representing 90-100% of app downloads in 2021. It found the usage of alternative Android app stores, both by device users and app developers, is substantially lower.

110. Other existing Android app stores do not discipline Google's exercise of monopoly power. No other app store reaches nearly as many Android users as the Play Store. That is because the Play Store is preloaded by OEMs on practically all Android mobile devices sold outside of China. With the exception of app stores designed for and installed only on mobile devices sold by a respective OEM, such as the Samsung Galaxy, no other Android app store is pre-installed on more than 10% of Android devices, and many have no appreciable market penetration at all. Aptoide, for example, is an Android app store that claims to be the largest "independent" app store outside of China, but it comes pre-installed on no more than 5% of Android mobile devices.

111. As further proof of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps purchased through the Play Store, which is substantially higher than would exist under competitive conditions. Also, Google's successful campaign to quash competition in Android app distribution has ensured that alternative methods of distribution — such as through other Android app stores or direct downloading — now account for only a small share of the market, and the vast majority of app developers and consumers do not consider them reasonable substitutes for the Play Store.

112. Google's monopoly power is also durable. Because of Google's success in

maintaining its monopoly in Android app distribution, there is no viable substitute to distributing Android apps through the Play Store. The Play Store offers over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing. The Play Store therefore benefits from network effects based on the large number of participating app developers and users: the large number of apps attracts large numbers of users, who value access to a broad range of apps, and the large number of users attracts app developers who wish to access more Android users. Android OEMs find it commercially unreasonable to make and sell phones without the Play Store, and they view other app stores as poor substitutes for the Play Store.

113. Moreover, as the United Kingdom's Competition and Markets Authority found in a June 2022 Report, alternative Android app stores, especially new entrants, also face barriers to effective competition. "For example, while manufacturers' app stores could be sideloaded . . . sideloading is limited in practice. Similarly, while one manufacturer could seek to enter into preinstallation agreements with another manufacturer, there is no evidence this occurs in practice. The incentive to preinstall another manufacturer's app store is further reduced by manufacturers' agreements with Google leading to the pre-installation of the Play Store which provides access to such a large range of apps."

114. Sideloading currently places only a limited constraint on the Play Store, partly because app developers do not currently use sideloading as a distribution channel or identify it as an alternative to the Play Store, including because Google has imposed barriers to sideloading and blocked methods of app search and discovery outside of the Play Store. There are third-party app stores that can be sideloaded on Android, such as APKpure and F-Droid. But use of these app stores is extremely low. Web-based alternatives, including websites and web apps, likewise are

rarely used and do not place a constraint on the Play Store.

115. Google takes various steps to discourage OEMs and carriers from directly competing or sponsoring any app distribution competition. Google has paid carriers 20 to 25% of app store purchases to prevent them from creating a competitive offering. Google also makes the sideloading process unnecessarily cumbersome and impractical by adding superfluous, misleading, and discouraging security warnings and by deterring users by requiring them to grant permission multiple times for a single app installation. Other Google tactics also prevent competitive entry into the Android app distribution market, as alleged below.

116. Following trial in *In re Google Play Store Antitrust Litigation*, the jury found that Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct in the Android app distribution market worldwide, excluding China. *See* Verdict Form at 3-4, *In re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD, ECF No. 606 (N.D. Cal. Dec. 11, 2023). After this same trial, the District Court also found "that Google does not contest that Epic presented sufficient evidence on Google's market power or the barriers to entry that existed in" the Android app distribution market. *See* Order Re Google's Renewed Motion for Judgement As Matter of Law Or For New Trial in *Epic* Case at 16, *In re Google Play Store Antitrust Litigation*, Case No. 20-cv-05671-JD, ECF No. 606 (N.D. Cal. July 3, 2024).

**iii. <u>Branch Participates and Competes with Google in the Android App Distribution Market Worldwide (Excluding China)</u>**

117. Branch Discovery Search also competes in the Android app distribution market, including with the Google Play Store. Like the Google Play Store, Discovery Search provides a platform through which (a) consumers may search for, discover, and obtain apps for use on Android mobile devices that meet their specific needs and preferences by allowing consumers to search for, access reviews on, purchase, download, and install mobile apps using the mobile device

and an internet connection; Discovery Search searches across multiple apps (rather than, for example, within a single app, a single developer's apps, or a single app store); (b) app developers can drive new users to their apps; and (c) consumers receive recommendations for apps, including through paid search advertising (including text ads) from app developers. But unlike the Play Store, which distributes Android apps only through a single walled garden controlled by Google, users whose phones are equipped with Branch Discovery Search may obtain apps through multiple distribution channels, including competitive direct downloading (which Google terms "sideloading") or through competing non-Google app stores.

118. Google has recognized Branch's competition in this additional market and seeks to exclude Branch as a competitive threat to its app distribution monopoly. Google seeks to prevent Discovery Search specifically from creating an alternative method for distributing, searching for, recommending, and downloading Android apps outside of the Play Store and thus acts to keep Branch away from this market by singling out Branch and coercing Android OEMs and carriers to put a stop to Discovery Search's functionality and to not integrate or distribute their devices with Branch Discovery Search. With Discovery Search, Google fears that, rather than opening the Play Store to search and download apps, users could instead swipe up or down on the home screen of their devices and, with less friction, search for relevant apps and app content across the universe of Android apps, whether already installed on their device or not.

119. For example, in the same emails in which Google employees discussed their scheme to "stop" this Discovery Search functionality from being integrated in the Android ecosystem, Google itself recognized Branch as a competitor to Google in the Android app distribution market. Google recognized that, with Discovery Search, users could "search across multiple apps" and deliver "results from Netflix, Pinterest, Yelp, Galaxy Store, Play store, other

3rd party apps etc," as demonstrated in the below screenshot Google employees took and discussed as to Discovery Search's app distribution functionality on a Samsung device (*see* Figure 5):

**FIGURE 5**




120. Google is not alone in recognizing Branch Discovery Search as a competitor and innovative threat to Google in the Android app distribution market. For example, both Samsung and T-Mobile have expressed interest in Discovery Search's "app download model" and "app-install ad campaigns," but each expressed concerns whether Branch's app distribution technology "conflicts with our google agreement" including "MADA." As Samsung put it, "[t]his is probably Google being aware of Branch as you mentioned on their call and attempting to kill all of Branch's attempts," including "app install suggestions." As another example, AT&T also was interested in

Discovery Search's functionality that allows an app developer to "decide if the user does not have the application should they be take[n] to their website or the app store to download the [] app."

121. Consistent with this recognition, Branch is a competitor in the Android app distribution market. Branch's intention to compete with and provide an alternative to the Google Play Store (for users, app developers, competing app stores, advertisers, OEMs, and carriers alike) and provide a more direct Android app discovery and distribution technology is demonstrated by, for example, its public-facing contemporaneous statements and by the contracts and relationships that it has built with Android device distributors, app developers, and advertisers. In fact, Branch has not just attempted to provide Android app distribution services, but has actually succeeded in doing so, albeit on a smaller scale, with narrower distribution, and in more limited integrations than it would have but-for Google's anticompetitive conduct.

122. Moreover, Branch's ability to compete in the Android app distribution market — but-for Google's anticompetitive conduct — is demonstrated by the same and similar factors that enabled its ability to compete in the Android application search services market, including its ability to obtain financing, purchase necessary facilities and equipment, consummation of contracts, and other affirmative actions to enter the app distribution business. For example, Branch has secured relationships with more than 100,000 app developers, built technology that would enable direct downloads by users of previously uninstalled apps or through any other channel selected by an app developer, and has been integrated in some form on various Android devices, including the Samsung device that Google used to demonstrate how Discovery Search could direct consumers to the Galaxy Play Store instead of the Google Play Store.

123. Some of the advantages of Branch's technological innovation in the Android app distribution market include that (a) Discovery Search is accessed through a generic search box,

such as by pulling down or swiping up on the device (rather than by opening a separate app store application); (b) Discovery Search can direct users to download and install new applications through any competing app store or by direct downloading (rather than only in the Play Store or in a single competing app store) (*see* Figure 6); (c) Discovery Search in-app search results are based on each device user's personal preferences (rather than on the Google Search or Play Store algorithms); and (d) Discovery Search functions outside of Google's monopolies (in which Google imposes supra-competitive download prices and fees, dictates which apps are featured, and controls the search algorithms, which Google uses to secure its dominance in other markets).

**FIGURE 6**




124. This technological innovation from Discovery Search poses a competitive threat not only because it provides a better user experience and is free from Google control, but also

because search is a key method of app discovery. If consumers searched for apps on Discovery Search, rather than through Google, that threatens not only to lead consumers to apps outside of the Google Play Store, but also reduces traffic on Google Search, which in turn reduces advertising revenue Google receives through Google Search and Google Play Store Search.

125. As Google itself has reported, "search is a major source for app discovery, according to our research: One in four app users discovers an app through search." According to the same report, "Discovery through a search engine is especially prevalent for local apps, as are the tech (looking for reviews of new gadgets, for example) and travel (such as wanting to confirm trip details) categories. In these three categories, people are 26% (local), 59% (tech), and 30% (travel) more likely than the average to use search to find the apps they seek."

126. Similarly, Google also reports, "People not only turn to search to find new apps; they actually download apps because of search ads. They're among the most effective ad formats for driving app downloads: Of those who downloaded an app based on an ad viewed on their smartphone, 50% said they were prompted to do so by a search ad. This shift in how consumers find and learn about new apps paves the way for marketers to rethink their brand's approach to app discovery. And there's good reason to tap into search to help boost app awareness. Search ads don't just raise app visibility; they also drive app downloads – by being there at the exact moment when a consumer is actively looking for apps."

127. Research also shows that driving app discovery and installation through deep linking leads to improved conversion, engagement, and retention of new users. For example, users who install an app from a deep link are twice as likely to remain in the app after one month, have improved click-to-install rates by six times, and engage with that app twice as much.

128. Further, Discovery Search also poses a competitive threat to Google's Android app

distribution monopoly by lowering barriers to entry and enabling other app distributors to compete with Google. For example, Discovery Search lowers the friction and barrier to entry that competing app stores and app developers face when trying to get their apps seen outside of Google Play or Google Search. For app developers, they need not list their apps in any app store at all, including because Discovery Search otherwise would provide a non-Google controlled avenue through which to discover and download apps for Android devices. Because Google prevents apps from being discovered in Google's Search products unless the developers also list those apps in the Play Store, providing an alternative, integrated avenue through Discovery Search for users to search and discover apps would thwart another Google forcing mechanism to prop up the Play Store.

129. With Discovery Search, for competing app stores, users can be directed to download relevant apps in their app stores even if that app store is not prominently featured on the user device, as is required of the Google Play Store. Therefore, but-for Google's anticompetitive conduct, Branch Discovery Search would have lowered barriers to entry in the Android app distribution market by bypassing the stickiness of defaults altogether; users would not be directed to a default store but instead given the choice to download relevant apps by direct download or competing app store.

130. As a result of Google's anticompetitive conduct directed at Branch, Google is foreclosing a rival Android app distribution point through which users might otherwise bypass and avoid Google's dominant, defaulted Play Store for other competing methods of Android app distribution. Google seeks to kill Discovery Search not only to foreclose competition from Branch, but also as a means to harm other competitors in the Android app distribution market — including competing app stores and app developers who would have distributed their apps through direct download — because foreclosing Discovery Search will continue to deny competing app stores

and developers traffic and a path to be found and used outside of Google's Play Store monopoly.

## D. Search Advertising

### i. Search Advertising in the U.S. is a Relevant Antitrust Market

131. Search advertising in the United States is a relevant antitrust market. The search advertising market consists of all types of ads generated in response to online search queries, including advertisements served in response to queries on general search engines, specialized search providers such as Amazon, Expedia, and Yelp, application search providers such as Branch Discovery Search, and social media sites.

132. Advertisers use search advertising to target marketing messages in real time in response to queries entered by a consumer. The user's query reveals their specific motivation or interest at the time it is entered, and advertisers can customize ads to serve that specific interest. The ability of search ads to respond to consumer inquiries when the consumer is searching something relevant to an advertiser's product or service, makes these ads uniquely valuable to advertisers and distinguishes them from other types of advertising that cannot be similarly targeted.

133. Other forms of advertising are not reasonably substitutable for search ads. For example, "offline" ads such as newspaper, billboard, TV, and radio ads cannot be targeted at a specific consumer based on the consumer's real-time, self-disclosed interests. Similarly, other forms of online ads, such as display ads (*i.e.*, images or videos on a site with a link to another site) and non-search social media ads (*i.e.*, display ads integrated into a social media feed and not displayed in response to a search), do not enable advertisers to target customers based on specific queries in real time and are generally aimed at consumers who are further from the point of purchase. As Google's Chief Economist explains: "One way to think about the difference between search and display/brand advertising is to say that 'search ads help satisfy demand' while 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary

tools, not competing ones."

134. Few advertisers would find alternative sources a suitable substitute for search advertising. Thus, there are no reasonable substitutes for search advertising, and a search advertising monopolist would be able to maintain prices above the level that would prevail in a competitive market.

135. The search text advertising market is a relevant subproduct market of the search advertising market. Search text advertisements, or "text ads," are displayed in response to a user's query. Like search ads, they are distinguishable from social media and display ads for the reasons alleged above. Text ads have various unique features that also differentiate them from other types of search ads, such as product listing ads. Largely text-based, text ads have the appearance of organic search results and provide links to the advertiser's site. Advertisers write the "copy" for text ads but do not do so for product listing ads. Advertisers value this control because it allows them to highlight discounts, seasonal offerings, new products, or other promotions. Further, unlike product listing ads which can feature only tangible goods that can be depicted visually, text ads may be used to sell all manner of goods and services. Over 92% of Google's advertisers only purchase text ads, while a mere 5.5% of Google' advertisers purchase both. Unlike product listing ads, the appearance and content of text ads is controlled by the advertiser. For these reasons, Google and its advertisers recognize text ads as a distinct product market. Further, whereas product listing ads prices have remained stagnant or decreased from 2016 to 2020, text ads prices steadily climbed over that same period. Indeed, over the years, Google itself has tested whether it can profitably raise its text ads prices by 5% or more without losing substantially advertisers, and the results have been largely consistent — it can.

136. The United States is a relevant geographic market for the search advertising market

and its search text advertising submarket. This is recognized by market participants. Google, for example, offers advertisers the ability to target and deliver ads based on the location of consumers in the United States, and Google Search is customized for particular countries. Google also separately tracks search advertising revenue for the United States.

#### ii. Google Has Monopoly Power in the U.S. Search Text Advertising Market

137. Google has monopoly power in the search text advertising submarket. Google possesses a large and durable share in the search text ads market, which is protected by significant barriers to entry. In 2020, its market share in the search text ads market was 88%, having grown steadily from 80% in 2016. During the U.S. Department of Justice's case against Google, advertisers confirmed Google's market dominance in the search text ads market, including through testimony that their text ads spending mirrors Google's relative search query volumes (*i.e*., 90% of their spend is on Google). Barriers to entry are high, including to build both a search service and an ad platform to deliver text ads on that search service. These barriers to entry thus insulate from erosion Google's longstanding, dominant market share in the search text advertising market. Notably, Google also does not consider competitors' pricing when it sets text ads prices.

138. Following trial in *U.S. v. Google*, the District of Columbia issued findings of fact and conclusions of law holding, "Google has monopoly power in" and "has monopolized the market for general search text advertising." Memorandum Opinion at 185-189, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024).

#### iii. Branch Participates and Competes with Google in the U.S. Search Text Advertising Market

139. Branch Discovery Search competes in the search advertising market, and the search text ads submarket, including with Google's own products like Google Search and Google Play Store that serve ads in response to search queries. In fact, Branch has not just attempted to provide

search advertising (including search text advertising) on Discovery Search, but has actually succeeded in doing so, albeit on a smaller scale, with narrower distribution, and in more limited scope than it would have but-for Google's anticompetitive conduct. Discovery Search is prepared to compete more robustly for search advertising, including search text ads, using its ad technology infrastructure and contracts with major brands and advertisers.

## III. GOOGLE'S UNLAWFUL CONDUCT

140. Google willfully and unlawfully restrains competition in the relevant markets. It has maintained and extended its monopolies, through a series of anticompetitive and exclusionary practices that substantially foreclose competition in the relevant markets — including by foreclosing Branch Discovery Search from the Android ecosystem.

### A. Google's Anticompetitive Android Agreements With OEMs and Carriers

141. Google's anticompetitive conduct in the relevant markets is effected principally through a series of exclusionary agreements with OEMs and carriers that distribute Android mobile devices, including the Mobile Application Distribution Agreements (MADAs) and Revenue Share Agreements (RSAs).

#### i. Mobile Application Distribution Agreements (MADAs)

142. Google has entered into MADAs with all Android OEMs. The MADA is a device-by-device license that applies worldwide, except in China, that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem. The suite of applications is referred to as Google Mobile Services (GMS). Under the MADA, Google requires OEMs to preload certain applications in prominent places on each licensed device. The MADA may be terminated only upon a breach by either party.

143. Under the MADA, OEMs must preload all 11 GMS apps on each new device they manufacture and distribute — and six of these apps, including the Google Play Store, Google

Search, and the Google Chrome internet browser, cannot be deleted by the device owner. The MADA bars these apps from being deleted even though Google recognizes it could "make [the] phone experience better for user[s] by ensuring . . . preloaded apps are deletable," including so "[u]sers can free up space by deleting apps they don't want."

144. The MADA also requires the Google Play Store to be featured on the default home screen of each Android device. Without a MADA, an OEM cannot distribute the Play Store at all, and without the Play Store, a device cannot support the functionality of any Android apps (even those developed by third parties) because the Play Store provides the necessary APIs to run apps on Android mobile devices.

145. As one Google employee summarized, "we require Play + other GMS apps" — "to take all or nothing." Taken from a once-secret Google document, the screenshot in Figure 7 illustrates how Google ties the Play Store to the sale of these other Google apps.

**FIGURE 7**



146. Nearly every Android mobile device is and remains subject to the MADA — as of 2019, this resulted in approximately 2.3 billion Android devices being subject to the MADA. Further, when questioned under oath by the U.S. Department of Justice, Google employees were not aware of any non-MADA Android device sold in the United States. And there are no Android OEMs that have RSAs with Google but are not subject to MADAs.

147. As its own documents admit, Google uses the MADA to secure "baseline distribution of [its] apps on Android." Not only is the Play Store technically required, but it also contributes significantly to the user experience, especially in the absence of other app stores on Android. Indeed, users, OEMs, and carriers alike view the Play Store as essential and as providing core functionality of the Android device. As one example, even Microsoft signed a MADA (thereby preloading the Google Search Widget and Chrome browser, the rivals to its Bing and Internet Explorer) for its Duo devices because Microsoft "needed the license from Google." Even a firm as large as Microsoft is forced to accept Google's terms because, without the Play Store, the "phone is a brick." In short, the Play Store is a must-have on all Android devices.

148. The Play Store is thus critical leverage for Google's exclusionary conduct. As Google admitted in another document uncovered by the U.S. Department of Justice, if it were otherwise such that OEMs and carriers "no longer need the Play store for Apps on their phones," this "would then weaken the leverage that MADA provides," and "[w]ithout MADA, we would not be able to incentivize placement of the [Search] Widget, which drives [redacted] of search revenue on a devices and secures other 1P apps like Chrome and Assistant." According to internal Google communications, "there is value in the leverage that Play provides to get some of the non-critical GMS apps on a phone. What I mean by that, is that OEMs want the Play store on their phone, and in return we are able to get other apps like Google Search and chrome, Maps and Duo,

Youtube and Drive (for instance) on the phone as a result."

149. Under the MADA, once the OEM adopts the necessary suite of Google apps, the search access points of those apps are *all* preset to default to Google's search engine. For example, part of the GMS suite of applications is the Google Search Widget (or Quick Search Box or QSB). OEMs are required to preload and place the Search Widget on the default home screen of the device. According to Google's internal documents, "QSB is the dominant entry point for AGSA [Android Google Search App or Android Google App (AGA)] Searches" — in fact, over 50% of all search revenue on Android devices flows through the Google Search Widget alone.

150. MADA signatories also must accept Google's Chrome browser, and generally agree to place Chrome in the Google applications folder, which the MADA requires to be featured on the default home screen. The MADA also requires that this pre-installed version of Chrome is preset to default to Google Search. A senior Google executive referred to changing Chrome's preset search default as "totally off the table" and insisted that if an OEM "values their MADA, they cannot modify Chrome's settings."

151. The MADA also imposes voice-search preferencing. In addition to requiring the pre-installation of Google Assistant, the MADA also requires OEMs to (1) implement a Google "hotword," which activates Google Assistant, (2) ensure certain touch actions on the device's home button directly access Google Assistant or Google Search, and in many cases (3) set Google Assistant as the default assistant app on Android devices.

152. The MADA therefore locks up for Google Search nearly all (if not all) of the search access or entry points on Android mobile devices (as Google itself illustrated in Figure 8 below).

**FIGURE 8**




153. In sum, among other requirements, Google requires all MADA signatories to pre-install and feature (a) the Play Store on the home screen of their devices, (b) the Google Search Widget in the center of that home screen, and (c) Chrome on the home screen with Google set as its default search engine. These placements are crucial to Google because, as its CEO has admitted, placement on a default home screen "typically" leads to more usages of an app.

154. Although users can delete the Google Search Widget that must be pre-installed on the center of the home screen by OEMs under the MADA, few users delete it, especially as a proportion of Android activations.

155. End users are even more unlikely to change their default search access point, and Google has known and exploited this for years. Google has recognized that "most end users do not change defaults." As Google's behavioral economics team wrote in 2021: "Inertia is the path of the least resistance. People tend to stick with the status quo, as it takes more effort to make

changes." Many users do not even know there is a default search engine, what it is, or that it can be changed. Google also understands that "[u]ser behavior is more heavily influenced by default settings on mobile and tablet."

156. In short, as Google itself recognizes, a "search engine in the default position receives additional search volume beyond what it would otherwise receive."

157. Google also recognizes that securing this default placement is extremely valuable for monetizing search queries. In 2017, Google estimated that its default placements drove over half of its overall search revenue and was growing. In 2019, about 50% of all search revenue on Android devices flowed through the Google Search Widget alone. And for devices manufactured by Samsung — the largest Android OEM — approximately 80% of search revenue earned on those devices flowed through default placements secured by the MADAs.

158. For these and other reasons, for general and application search services products, preinstallation and integration into mobile devices is essential to effective distribution of the product. Indeed, Branch rapidly recognized that, whatever other means of distribution for Discovery Search might theoretically be possible (e.g., trying to get users to find and download Discovery Search in an app store like the Google Play Store), pre-installation and integration with devices out of the box would be necessary to obtain any meaningful scale and network effects.

159. As discussed throughout this Complaint, Google has long taken and continues to take steps to ensure that Google products occupy virtually all search access points on each and every Android device. This alone posed a barrier to effective distribution or integration of Branch Discovery Search. Recently uncovered evidence explains that MADAs made it difficult even for renowned and well-capitalized competitors like Amazon to obtain "premium placement" for its own app store. The same is true for general and application search products.

160. These factors have thus resulted in all Android OEMs signing the MADA, with all Android devices continuing to feature the Google Search Widget and Chrome on the home screen to the exclusion of rivals. The MADA has thus been a highly successful tactic for Google and its anticompetitive conduct — as of 2019, Google's internal calculations showed that Google's share of queries on mobile general search engines was a staggering 98%, and Google's share of all search queries made on a mobile device was 94.9%.

**ii. <u>Revenue Share Agreements (RSAs)</u>**

161. Google also has entered into RSAs with OEMs and carriers. For example, Google has RSAs with OEMs such as Samsung and Motorola and with carriers such as Verizon, AT&T, and T-Mobile. RSAs may be terminated only if either party breaches the contract. Moreover, Google structures its RSAs to penalize any distributor that might walk away, continuing to tie them to Google permanently. Although the typical term of an RSA is two to three years, if an OEM or carrier were to choose not to renew its RSA with Google, the RSAs provide that the distributor loses revenue share not only for new mobile devices but also for the phones and tablets previously sold and in the hands of consumers.

162. Google has technically separated these RSAs from the MADAs, but not so in practice, intent, or effect. For example, although no OEM or carrier is required to sign an RSA, all continue to do so in practice. After all, as Google understands and exploits, it would be irrational for a profit-maximizing firm to sign a MADA (and pre-install Google's applications like Search and Play Store on the devices they distribute) but then forgo the revenue share (that Google would transfer from such apps being on those devices) via an RSA. Not surprisingly then, under questioning by the U.S. Department of Justice, Google was unable to identify any Android device presently sold in the United States that is subject to a MADA but not an RSA. In short, the purpose of the RSAs from the outset has been to formalize the practical exclusivity of the MADAs.

163. Google admits as much in recently uncovered documents. Google's documents reflect that it designed and intended the MADA and RSA — "Android's Core Commercial Agreements" — to form a complementary pair (*see* Figure 9). As Google put it, the RSA "[r]einforces MADA's distribution with additional protections for our revenue generating services," including "out-of-the-box search defaults and exclusivity."

**FIGURE 9**




164. Another recently uncovered document states that Google's RSAs "provide exclusivity of Search" and "prevent[] the pre-installation of other Search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user." As one Google executive explained internally in 2017, Google uses these RSAs "as a lever for motivating partner behavior that is consistent with our goals for Google and the ecosystem," and to "drive incremental revenue (securing search defaults not covered by MADA)."

165. In fact, Google's previously secret documents now reveal that Google separates the

MADA and RSA into two pieces of paper only to conceal its anticompetitive conduct. As one Google employee brazenly admitted, "Google cannot stop OEMs from preloading the Amazon App Store due to anticompetitive concerns on the MADA 2.0 only," but "[w]e can do this through revenue share deals" and "having stricter placement restrictions through revenue share" was something that would "help stem the tide of emerging app stores."

166. Another Google executive inquired internally why Google "doesn't put everything in the MADA" and asked, "Is it anticompetitive concerns or something more than that?" And the executive in charge of Google's Android relationships responded, "This might be better discussed in person as opposed to writing."

167. Each RSA generally follows a tiered structure, in which a carrier's or OEM's payment is tied to the degree of device exclusivity, including as to search access points and app distribution channels. So, in exchange for more defaults and higher value placements for its search and app distribution products across more devices, Google pays more revenue share.

168. For example, the Google-Samsung RSA requires Samsung to set Google as the default search engine on the "S[amsung] Browser" and not allow users to change that default from the browser search bar itself. It further requires that Chrome be set as the default browser and be featured in the hotseat or dock. The Google-Verizon RSA requires default placements to include the Google Search Widget and Chrome, and that Google be the default homepage on the browser. The Google-AT&T RSA requires that all search access points default to Google Search and that all devices preload the Google Search Widget on the default home screen. Some of Google's RSAs (for example, with T-Mobile) provide that the failure to configure a device on an exclusive basis means that the OEM or carrier is entitled to no bounty or revenue share at all.

169. The RSAs are device-by-device, meaning that each new device to be distributed

must be enrolled under the RSA, and OEMs and carriers theoretically can opt into different tiers based on the device model distributed each year. For example, at the "premier tier," which offers the highest revenue share, an OEM "may not install any app store on their device other than Google Play." In practice, however, nearly all (if not all) Android mobile devices distributed by OEMs and carriers each year continue to be enrolled at the highest level of exclusivity and thus revenue share, including because it would not be economically rational for any profit-maximizing carrier or OEM to opt for the lower-revenue share option.

170. Google also includes in each of the RSAs an express prohibition on pre-installation of any "Alternative Search Service." This is a critical exclusionary weapon in Google's anticompetitive arsenal, including vis-à-vis general search and application search competitors, and by extension Android app distribution and search advertising competition. Under these provisions, Google expressly limits the partner's ability to pre-install or promote a non-Google search engine, access point, or other general or application search functionality, in Google's "discretion."

171. For example, the T-Mobile and Motorola RSAs define "Alternative Search Service" as "any search service that is substantially similar to Google Search (as determined by Google in its reasonable discretion)." The Verizon RSA defines "Alternative Search Services" as "(a) any web or (b) any on-device search service that in response to queries incorporates multiple vertical search functionalities, and that, in each case of (a) and (b), offers functionality that is substantially similar to Google Search (as determined by Google in its reasonable discretion)." The AT&T RSA defines "Alternative Search Service" as "any application, product, or service, other than Google Search, which, in response to queries, delivers search results consistent of (a) internet content or (b) content from multiple applications on a Device that [is] owned by entities that are not Affiliates of one another, in each case of (a) and (b), in a matter that is substantially

similar to Google Search (as determined by mutual agreement of the Parties in accordance with section 7.2)." The Samsung RSA defines "Alternative Search Service" to include "any web or on-device search service (including on-device search that incorporates multiple vertical search functionalities) that offers functionality that is similar to Google Search."

172. Using these broad definitions, Google coerces its distributors not to deal with Google's competitors: the RSAs expressly preclude OEMs and carriers from preloading, installing, marketing, enabling phones to navigate to, or suggesting consumers use any "Alternative Search Service," or otherwise adjusting settings that would interfere with Google's default position.

173. During the U.S. Department of Justice's trial against Google, it was revealed that Google had expressly expanded these definitions of "Alternative Search Service" to stop Samsung and others from integrating Branch Discovery Search. In particular, when Google learned that Branch Discovery Search was to become "standard across all of Samsung's upcoming devices," Google hatched a secret, multi-pronged scheme "to stop the functionality." As to Samsung, Google first determined what its "Alternative search definition allows us to do." As to AT&T, Google planned "outreach to ATT specifically to get this resolved." And "[w]ith all US/CA carriers: confirm that other carriers have language (they should) that gives us ability to ask them to discontinue this practice" and "work with them on removing this functionality."

174. After informing OEMs and carriers that implementing Discovery Search "violat[es] their contracts" with Google and "pushing all US carriers to clearly meet the *Alternative Search Service* requirement," Google left no chances and amended each of its RSAs. The amendments enlarge their anticompetitive and exclusionary reach by expanding the definitions of prohibited "Alternative Search Services" to ensure that Branch Discovery Search (and other rival search technology) continues to be substantially foreclosed from Android mobile devices.

175. As the United States District Court for the District of Columbia found after trial in *U.S. v. Google*, "This change resulted from Samsung's preinstallation of an on-device search technology from Branch," Memorandum Opinion at 131 (¶ 390), *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024). Prior to this change, the Google-Samsung RSA had defined "Alternative Search Service" as "any web search service that is substantially similar to Google Search." *See id.*

176. Google's expansion of its RSA with Verizon is similarly instructive. For example, rather than defining exclusivity with reference to the term "Alternative Search Service," the 2009 Verizon RSA instead defined exclusivity based on the term "General Web Search," which it defined as "search functionality that produces search results by searching a large portion of indexable websites, and where such search results may also include, unless excluded herein, other non-website results. Examples of General Web Search include Google, Yahoo, and Bing search services." Further, the 2009 Verizon RSA also expressly provided that it did not limit partners' ability to preload "vertical and customizable search functionality such as . . . application search" onto covered devices and stated that such functionality was "not General Web Search" within the meaning of that contract. However, following Branch's technological innovations in the market and corresponding traction with OEMs and carriers alike, by 2021, Google had redrafted the 2021 Verizon RSA to extend more broadly to any "Alternative Search Service," such as any "web" or "on-device search service" that "offers functionality that is substantial similar to Google Search (as determined by *Google* in is reasonable discretion)" (emphasis added).

177. The U.S. Department of Justice's investigation and enforcement action has revealed that Google's specific intent to "kill" Branch through enforcing its MADAs and RSAs with OEMs and carriers has been effective. For example, as Samsung executives remarked internally, "Clearly

this is a case where our side can't risk not taking the money," "but Google is clearly buying its way to squelch competitors." As another example, an AT&T executive testified that AT&T has so far decided not to proceed with pre-installing and distributing Branch Discovery Search given the "risks associated with" its RSA, including that Branch could be "considered a competing or alternative search," which would require AT&T to "forego[] the Internet search revenue from Google and instead just earn[] this on-device search revenue from Branch."

178. New documents and testimony confirm that Google's RSAs have been equally coercive and forcing for other OEMs and carriers, even the largest and most successful. For example, during one set of RSA negotiations with Google, Verizon attempted to limit the search access points governed by its RSA and to strike an exclusivity provision stating that "Company will not include on the device any alternative search service that is similar to Google Search." Google responded that Verizon could not preload any other search engine — even its recently purchased Yahoo Search — and still receive the then-20% revenue share, which would instead drop to a lower percentage. Internal Google documents now reveal that this position was part of Google's larger policy that "all go-forward agreements with carriers include exclusivity provisions and exceptions cannot be made." When presented with this Hobson's choice, Verizon ran the numbers and determined that the lower exclusivity percentage would result in a $1.4 billion loss in revenue to the company — which, simply, was "not worth it."

179. Google likewise uses revenue share as a way to protect its Android app distribution monopoly, including by offering (a) substantially higher revenue shares through a new tier requiring Google Play Store exclusivity; (b) a separate, even more costly agreement, with the primary threat to Google's app distribution monopoly — Samsung; and (c) pay-offs to key app developers that might work with Samsung, or another app distribution competitor, which Google

gave a secret codename, on information and belief, "Project Hug."

180. At the same time, Google was aware that if Samsung learned of Google's returns from its control of the Google Play Store, it would be harder to keep Samsung from competing in the app distribution market. Google employees repeatedly emphasized the importance of keeping this information from OEMs, including Samsung. Google thus combined Samsung's Search revenue share with its Play Store revenue share when it presented its offer to Samsung. Given the information asymmetry between Samsung and Google, Google used this and similar tactics to obscure from Samsung (and other OEMs and carriers) the benefits of competing with Google.

181. The size of Google's annual RSA payments to OEMs and carriers demonstrates the enormous value of default status and exclusivity provided by the agreements. In 2021, for example, Google spent $26.3 billion in traffic acquisition costs — *i.e.*, the revenue share paid to its partners — which is four times more than the company's other search-related costs combined, including research and development. Moreover, particularly for newer entrants, the RSAs present a substantial barrier to entry. Even if entrants could pay the billions of dollars that Google does for the key forms of distribution — pre-installation, premium placement, and default status — it would be very difficult to displace Google as long as the exclusionary RSA and MADA terms remain in place. Instead, rivals and new entrants are relegated to inferior forms of distribution (or no distribution at all) that do not allow them to build scale, gain brand recognition, and generate momentum to challenge Google.

182. For these reasons, Google views RSAs as "very strategic to Google" and essential to securing search query and app distribution traffic on Android devices to the exclusion of rivals, like Branch. As one Google executive explained in a secret but now public email, "Our philosophy is that we are paying revenue share *in return for* exclusivity" and to ensure a rival cannot "come

and steal away Android search distribution at any time." Another executive explained, "being exclusive across all the android search entry points is very strategic to mobile search."

183. Google thus decided, "We need to incentivize carriers to ship Google using the same approach we at Google have used for many years: 'We will pay for revenue share in return for exclusive default placement.' This contract is an exchange . . . . Without the exclusivity we are not 'getting' anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google . . . . Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google."

184. In other documents, Google has characterized these RSAs as an "[i]nsurance policy that preserves our search and assistant usage." To preserve its dominance, Google has developed economic models to measure the "defensive value" of foreclosing search rivals from effective distribution, search access points, and ultimately competition. And Google employees have now admitted under oath that Google's RSA 3.0 was developed "to respond to increasing app store competition from OEMs and large platforms," and that changes to RSA were proposed "to protect Google from key strategic risks," including lost revenue due to "Chinese OEMs and Samsung . . . actively investing in creating their own app and services ecosystems." In short, Google recognizes that it can pay search distributors to "protect [its] market share from erosion."

185. Although Google tried to keep them from regulators and litigants by falsely claiming they were "privileged and confidential," other newly uncovered documents similarly reveal Google's belief that, while "MADA protects the widget on the device," the RSAs ensure "Chrome is in the hotseat/set as default browser on carrier devices" and "protect[]" the rest of the search traffic on each device. In the same document, the Google employee boasted that this leaves only a small percentage "of the search revenue of the device to any rival who wants to buy us out"

and "even if a rival monetizes as well as Google, it will be hard for them to overcome our [] rev share offer as they would have to give up at the minimum, [redacted] of their monetization."

186. Further, another internal Google analysis of these restrictive agreements concluded that only 1% of Google's worldwide Android search revenue was currently at risk to competitors. This analysis noted that the growth in Google's search advertising revenue from Android distribution is "driven by increased platform protection efforts and agreements."

187. The predictable result of Google's anticompetitive conduct: over roughly an entire decade, no search firm other than Google has secured preset default search status on any pre-installed search access point on any Android device. These Android distribution MADA and RSA agreements — individually and taken together — are not just exclusionary in the first instance; they also are self-reinforcing and entrench Google's monopolies through their anticompetitive effects. For example, they (1) foreclose a substantial share of the relevant markets, (2) prevent rivals from achieving scale through additional user queries and audience, and (3) diminish the incentives of rivals to invest and innovate in search and app distribution technologies, including because Google continues to foreclose efficient channels of distribution for such technologies.

188. In August 2024, the United States District Court for the District of Columbia found that (1) Google's MADAs and RSAs "are exclusive and have anticompetitive effects, (2) Google has not offered valid procompetitive justifications for those agreements," and (3) "Google is a monopolist, and it has acted as one to maintain its monopoly [in the general search services market]. It has violated Section 2 of the Sherman Act." Memorandum Opinion at 4, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024).

189. Additionally, the evidence of Google's ongoing anticompetitive conduct, while already substantial and found to violate the Sherman Act, would almost certainly be even more so

but-for Google having willfully failed to preserve relevant communications and allowing employees at all levels to take affirmative acts to hide material evidence of Google's antitrust violations. A federal court in the Northern District of California recently found "an abundance of pretrial and trial evidence demonstrating an ingrained systemic culture of suppression of relevant evidence within Google." *Epic Games, Inc. v. Google LLC et. al.*, MDL Case No. 21-md-02981-JD, Member Case No. 20-cv-05671-JD, ECF 672 at 25 (N.D. Cal. July 3, 2024).

190. For example, one Google employee involved in RSA issues said in Google Chat messages that she did not have a certain document because "competition legal might not want us to have a doc like that at all :)." This same witness was involved in other Chats where, in a discussion about MADAs, she asked to turn the history function off because of "legal sensitivity," and to turn off history in another Chat concerning RSAs, so there would be no "trail of us talking about waivers, etc."

191. This was not isolated conduct. The district court in *U.S. v. Google* condemned "Google's long-time practice (since 2008) of deleting chat messages among Google employees after 24 hours, unless the default setting is turned 'history on,' which preserves the chat," a failure that "continued even after Google received the document hold notice at the start of the investigative phase of this case." Memorandum Opinion at 273, *U.S. v. Google*, Case No. 1:20-cv-03010-APM, ECF No. 1033 (D.D.C. Aug. 5, 2024); *see also id.* at 275 ("the court is taken aback by the lengths to which Google goes to avoid creating a paper trial for regulators and litigants . . . . It trained its employees, rather effectively, not to create 'bad' evidence.").

192. Another telling example of the acts that Google has taken to conceal, perpetuate, and avoid account for its anticompetitive conduct is its years' long practice of directing its employees to avoid using certain terms because of antitrust concerns. For example, in March 2011,

Google prepared a presentation on "Antitrust Basics for Search Team," which directed employees to "[a]void references to 'markets,' or 'market share' or 'dominance,'" "[a]void discussions of 'scale' and 'network effects,'" and "[a]void metaphors involving wars or sports, winning or losing." As another example, in 2019, Google told employees not to "define markets or estimate share" and to "[a]ssume every document you generate . . . will be seen by regulators."

193. Another example of Google's "willful conduct to hide material evidence," was Google's "frankly astonishing abuse of the attorney-client privilege." *Epic Games, Inc. v. Google LLC et. al.*, MDL Case No. 21-md-02981-JD, Member Case No. 20-cv-05671-JD, ECF 672 at 24 (N.D. Cal. July 3, 2024). Google used what was internally-dubbed a "fake privilege" scheme, in which Google executives and employees were instructed to mark documents privileged or to copy in-house lawyers not because those documents concerned legal advice but because the practice would help keep secret Google's anticompetitive schemes.

194. Google clearly followed this practice as to Branch, and but-for regulators, other civil litigants, and federal judges catching on to it, Branch might never have learned of the above-quoted internal emails and presentations which also were falsely designated "privileged." The Google slides and emails concerning Branch cited throughout this Complaint are prime examples of what the Court in the *Epic* case called an "astonishing abuse of the attorney-client privilege" — these are Google's commercial strategy documents, yet they were falsely marked "Attorney Client Privileged" and "Privileged & Confidential." *See, e.g.*, Figures 1-2. Fortunately for Branch and others, these highly relevant documents were ordered produced and made public in *U.S. v. Google*.

**iii. <u>Additional Android Agreements</u>**

195. Although its MADAs and RSAs are sufficient to accomplish its anticompetitive goals, Google also has used and continues to use other anticompetitive agreements to restrain trade in the relevant markets.

196. For example, Google uses so-called anti-forking agreements — such as the Anti-Fragmentation Agreement (AFA) and Android Compatibility Commitment (ACA) — to inhibit the development of an operating system based on an Android fork that could serve as a viable path to market for a search or app distribution competitor. In software engineering, a "fork" refers to taking one software package, copying it, and starting independent development on it to create a distinct and separate (*i.e.*, "forked") piece of software. Distributors know that any violation of an anti-forking agreement could mean excommunication from Google's Android ecosystem, loss of access to Google's must-have GMS and Google Play, and loss of millions or even billions of dollars in revenue share. Thus, distributors avoid anything that Google might deem "fragmentation" — a term that Google "purposely leave[s] . . . very vague" and interprets broadly.

197. Google also has final say over whether a device is found to be compatible with the technical specifications that Google requires manufacturers to meet before they can pre-install GMS. As a Google engineer noted, it must be "obvious to the [manufacturers] that we are using compatibility as a club to make them do things we want." Google views its anti-fragmentation mandate, and its final approval of devices before they launch, as a "poison pill" to prevent deviation from the Google-controlled Android ecosystem.

198. The AFA and ACC compatibility standards also require OEMs to implement Google's restrictions, warnings, and messages concerning sideloading (as discussed further below). These agreements foreclose OEMs from modifying Android to offer frictionless sideloading of competing app stores, which Google considers an impermissible "Android fork."

199. As another example, Google also degrades potential alternative app distribution channels by preventing app developers from advertising these channels through Google's marketing properties. Google's App Campaigns program allows developers to promote apps

through ad placements on key online advertising channels, including, *inter alia*, Google Search, YouTube, Discover on Google Search, and the Google Display Network. These placements are optimized for the advertising of mobile apps and have proven successful: according to Google, one out of every four users discovers an app through a search engine. And because Google Search is the overwhelmingly dominant search engine in the United States (and most of the world), it is a vital channel for app developers to reach customers. Ads on Google's YouTube are likewise a key means for developers to reach consumers. But within the Android ecosystem, the crucial App Campaigns program is limited to app developers that list their app in the Google Play Store. Android app developers must list their apps in the Play Store if they want to reach consumers through the vital channel of Google advertising.

200. As another example, Google also enters agreements with and buys off key app developers to deter them from making their apps available outside the Play Store, for example through direction distribution or through competing app stores. In particular, Google fears that key app developers might have strong enough relationships with customers and enough brand recognition to attempt to distribute their apps outside the Play Store — either through launches with other app stores or through direct downloading. If they did so, smaller developers might follow, and consumer interest in alternative app stores or consumer comfort with other forms of app discovery and download would increase.

**B. Google's Anticompetitive Campaign Against Direct Downloading of Apps**

201. Google also imposes a series of technological challenges and pretextual warnings designed to prevent users from directly downloading — or Google-termed "sideloading" — apps on Android mobile devices. The term "sideloading" itself reveals Google's view of the Android app distribution market: consumer use of the default Play Store is encouraged and expected, and use of a competing means of distribution is a problematic aberration.

202. Google recognizes sideloading as a competitive risk, and Google sets out to prevent it, even though this degrades consumer experience. To do this, Google embeds its generally misleading warnings and hurdles to sideloading into the Google-certified Android OS. In one, Google warns that the installation file "can harm your device." In another, Google simply blocks the attempted download, stating "your phone is not allowed to install unknown apps from this source" and presenting to the user only "Cancel" and "Settings" options (with no indication that installation is possible through the "Settings" option). In a third, Google warns that the user's "phone and personal data are more vulnerable to attack by" the "unknown app," and requires the user to actively opt in to select a feature by which he agrees that he is "responsible for any damage" to the phone "or loss of data that may result" from the installation. Recently disclosed internal documents demonstrate that Google knows it is degrading the user experience with its sideloading obstacles in order to protect its Android app distribution monopoly, but it continues to issue misleading statements and warnings to protect that monopoly.

203. The House Majority Report provided a similar description:

> Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores.

204. Moreover, even if a user overcomes Google's obstacles to direct downloading, the user faces continuous additional difficulties in keeping the sideloaded app up to date. This is because Google prevents sideloaded apps and app stores from updating in the background. Instead, users who sideload apps or app stores must manually approve every update via a multistep process.

205. Originally, Google created Android to allow sideloading, gain scale, and maintain

its image of "openness." After achieving dominance, however, Google increasingly saw sideloading as a threat to the Play Store and has now erected numerous barriers to thwart it, knowing full well that these barriers are based on pretext but will work to protect its Android app distribution monopoly, including from competitors like Branch Discovery. If not for Google's restrictions on sideloading, more app distributors and developers would directly distribute their apps to consumers. Google makes sideloading substantially and unnecessarily difficult, and in some cases prevents it entirely. Even if there were some legitimate justification for Google's broad campaign of anti-sideloading tactics — there is not — Google has pursued these goals by methods that are substantially more restrictive than necessary.

**C. Google's Anticompetitive Agreements With Apple and Browser Distributors**

206. Beyond its anticompetitive agreements with Android OEMs and carriers, Google also unlawfully maintains its general search services monopoly by entering into exclusive agreements with Apple and other browser distributors.

207. The Internet Services Agreement (ISA) is an agreement between Google and Apple, wherein Google pays Apple a share of its search ads revenue in exchange for Apple preloading Google as the exclusive, out-of-the-box default search engine on its mobile and desktop browser, Safari. The parties entered into the current ISA in 2016 and in 2021 extended it for a period of five years until 2026, at which point Apple can unilaterally extend the agreement until 2028, after which the agreement can be further extended by mutual agreement until 2031. Neither party has the right to unilaterally terminate the ISA prior to its current termination date.

208. The ISA requires Apple to set Google as the default search engine on Safari for all of Apple's devices. "Default" means the search engine "will automatically be used for responding to Search Queries initiated from the Web Browser software, unless the End User selects a different third-party search service." Apple gets about 10 billion user queries per week, and roughly 80%

of these queries are made in Safari. Further, only 5.1% of all searches on iPhones are conducted on a search engine other than Google. And queries entered through the Safari default (both mobile and desktop) account for 28% of all search queries in the United States. Although Apple does not preload Chrome onto its devices, Google pays revenue share to Apple on Chrome queries. In 2022, Google's revenue share to Apple was an estimated $20 billion.

209. Here again, although it is technically possible for users to change the search default on Safari, few people do, making Google the de facto exclusive search engine on Apple devices.

210. As it has with respect to its Android agreements, Google also has responded to search innovations on Apple devices by negotiating new contractual terms to foreclose such competition. For example, Google perceived Apple's "Suggestions" search feature as a threat to its search volume because Apple's "increasing use of their own variety of suggestions to the user [wa]s pushing the user away from completing the search on" Google, meaning that Google could not earn advertising revenue on those queries, which Google estimated would result in a loss of up to 15% search query traffic on Safari and a loss of up to 10% of iOS Safari revenue. In response, Google negotiated a new term in the 2016 ISA, which requires that Apple's implementation of the Safari default must "remain substantially similar" to prior innovations — that is, no innovation.

211. Beyond its agreements locking up distribution on Android and Apple devices, Google also enters into RSAs with browsers, including Mozilla, Samsung, and Opera. Google has recognized it is "crucial to retain web browser partnerships." Over 85% of all browser usage in the United States occurs on Google's Chrome browser or on one of the browsers covered by these RSAs. Browser RSAs typically last at least two years and are routinely extended.

212. Google's agreements with browsers generally require the browsers to make Google the preset default general search engine for search access points in both the browser's computer

and mobile versions. For example, the Mozilla RSA requires Google Search to be the default search placement on the Firefox browser, including in the "search box" in the browser, "the navigation or location bar," and in any "search box displayed on a Firefox Startpage."

213. In exchange for being the preset default general search engine, Google shares up to 40% of the advertising revenue it generates from these search access points with Google's browser rivals. For example, Google's 2021 revenue share payment to Mozilla was over $400 million, or about 80% of Mozilla's operating budget.

## IV. ANTICOMPETITIVE EFFECTS AND INJURY TO COMPETITION

214. Through its predatory and exclusionary conduct, Google has caused and continues to cause substantial and widespread harm to competition, including by locking up distribution channels, foreclosing rivals, reducing output, innovation, and choice, and increasing prices, including as alleged below for each of the relevant markets.

215. Branch has suffered and continues to suffer antitrust injury, *i.e.*, injury of the type that the antitrust laws were intended to prevent. Among other reasons, Branch may bring suit to recover for and stop Google's anticompetitive conduct in the relevant markets because Branch has been specifically targeted by Google's anticompetitive conduct in each market, is a participant in each market, and suffered injury in each market; Branch is a competitor, perceived competitor, or at least nascent competitor in each market; Branch's injuries are inextricably intertwined with and an integral aspect of Google's scheme to monopolize and restrain trade in each market; and Google's anticompetitive conduct against Branch has the intention and effect of thwarting the ability of Branch Discovery Search to lower barriers to entry into each relevant market.

216. Branch is also a proper plaintiff to sue for damages for the injuries caused to Branch by Google's anticompetitive conduct in each of the relevant markets. Branch's injuries and their causal link to Google are concrete and far from speculative. Google expressly, intentionally, and

specifically directed the alleged anticompetitive conduct at Branch Discovery Search and did so precisely because of the competition and threat that Discovery Search poses to Google's unlawful monopolies. Discovery Search is being foreclosed from the relevant markets and Android ecosystem because Google expressly forces Android OEMs and carriers to agree not to pre-install, distribute, market, or otherwise promote Discovery Search on their Android mobile devices.

217. Further, no other potential plaintiffs are better suited to vindicate the harms that Google has and is inflicting on Branch's business and property. Branch's injuries are direct, not indirect. There is no complex causal chain: Google used its monopoly power to force distributors not to work with Branch and thus compete in the relevant markets, and Branch is directly and immediately injured as a result. Branch is not standing in the shoes of or representing the interests of any more directly injured potential plaintiff. In addition to its ongoing desire and self-interest to be able to compete freely against Google in each of the relevant markets, Branch's past and ongoing damages are substantial and likewise make Branch a particularly proper plaintiff to vindicate the public interest in antitrust enforcement. Further, other potential plaintiffs have ongoing relationships with Google and/or other conflicts that have dissuaded them from vindicating the harms that Google inflicts on Branch, competition, and consumers in the relevant markets. Indeed, because Branch poses a threat to Google in and across each of the relevant markets that are dominated and unlawfully restrained by Google, Branch is a particularly appropriate private plaintiff to vindicate the public interest.

218. The fact and amount of Branch's injuries and damages are also concrete and not speculative, and recovery by Branch will not duplicate potential recovery by other plaintiffs, risk multiple lawsuits, or otherwise require apportionment. No unnamed party could recover for Branch's lost sales, profits, market share, or enterprise value. Branch's losses are directly

quantifiable and need not be apportioned from some aggregate loss to other potential plaintiffs.

**A. Application Search Services**

219. Google's anticompetitive conduct has destroyed and continues to destroy free and fair competition in the application search services market, affecting a substantial volume of commerce in this market. Google's conduct causes competitive harms across this market, including to competing application search firms, OEMs, app developers, Android app distributors, and consumers, including as alleged below.

220. Google's conduct harms competitor application search services, such as Discovery Search, by foreclosing them from getting distribution from Android OEMs and carriers — to such an extreme degree that Google now controls virtually the entire market for Android application search and rival technology cannot be integrated by distributors on an Android device. And but-for this foreclosure, these competing application search services firms could expand competition in application search services, and otherwise innovate new models of application content search and discovery and provide OEMs, app developers, Android app distributors, advertisers, and consumers choice beyond Google's own general search engine, application search products, and the Google Play Store.

221. Google's conduct also harms OEMs and limits competition in multiple respects. It forces OEMs to dedicate to Google Search and other mandatory Google applications valuable space on their devices' "home screen," even if they would, under competitive conditions, rather use that real estate for other purposes to differentiate their offerings to consumers, including to offer alternative application search services. Google's conduct also harms OEMs by precluding them from installing or promoting any non-Google application search technology, such as Branch Discovery Search, on their devices. Google's exclusionary requirements also limit OEMs' ability to innovate and compete with each other by offering new and more appealing (in terms of price

and quality) application search platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored and different combinations of pre-installed apps that would appeal to particular subsets of consumers.

222. Google's anticompetitive conduct also harms and limits competition from and among app developers. If they want their apps discovered by many Android users, they are forced to comply with Google's monopolistic terms and conditions, including paying Google's supra-competitive commissions on app downloads and in-app purchases. Google's rates would be lower but-for Google's unlawful conduct, including if apps could be discovered and installed outside of the Google Play Store. For example, Google's foreclosure of competing application search services prevents app developers from having their apps discovered, installed, and searched outside of Google's monopolies, such as through an application search service like Branch Discovery Search. With Discovery Search, apps could be directly downloaded and installed, such as from the developer itself or through a competing app store, neither of which would be subject to Google's anticompetitive restrictions and pricing. Google's conduct also harms app developers after the point of app download and installation by removing an app access point through which users would engage more frequently with that app developer's other relevant apps and content.

223. Google's anticompetitive conduct also harms and limits competition from other Android app distributors, including competing and would-be competitor app stores. By precluding all non-Google application search services from Android devices, Google harms competing and would-be competitor app stores by denying them an access point (not controlled by Google) through which consumers could discover and install relevant apps from their competing app stores. Indeed, when targeting and foreclosing Branch from the Android market, Google's employees themselves recognized that Branch Discovery Search could otherwise direct users to download

and install apps in both the Google Play Store and the Samsung Galaxy Store.

224. Google's anticompetitive conduct also harms consumers in multiple ways. Fundamentally, Google's exclusion of competing application search firms from getting distribution on Android devices limits output, innovation, and quality in the application search services market. Google denies Android users competition in application search services: consumers have no real choice but to use Google, regardless of relevant differences in quality (or lack thereof) in Google's offerings.

225. Google's exclusion of competing application search services firms also impairs consumers' ability to discover new apps, both because they are denied access to competing application search technology — including technology that does not prefer apps in the Google Play Store — and because Google has limited app developers' ability to distribute apps in innovative ways (e.g., through application search and direct downloading). Competing application search services would permit additional platforms to feature diverse collections of apps and app developers to develop more relevant apps that consumers desire, both because they are more likely to be discovered and because they would not be subject to Google's supra-competitive fees (which in turn affect consumers through higher app download costs and in-app purchase costs). Instead, consumers are left to sift through millions of apps in Google's monopolized Play Store, with Google controlling which apps are featured and identified or prioritized in user searches. Further, Google's anticompetitive conduct against application search services like Branch Discovery Search also harms consumers by denying them an additional, convenient access point through which to engage with the already-installed apps that are most relevant to each user's interests.

**B. General Search Services**

226. Google's unlawful exercise of monopoly power as a general search engine has also caused and continues to cause substantial anticompetitive effects in the general search services

market, including as alleged below.

227. The anticompetitive effects of Google's exclusionary conduct in the general search services market include, but are not limited to, substantial market foreclosure. This prevents rivals from achieving scale, which through network effects reinforces Google's dominant share. This also reduces the incentives of rivals — including Branch and emerging application search services providers — to invest and innovate in general search services. This, in turn, reduces output, innovation, and choice.

228. Google substantially forecloses competition in general search services. The foreclosure is so substantial that a large majority of search queries in the United States are controlled by Google and are not subject to meaningful competition. Through its exclusionary practices, Google locks up and forecloses existing and emerging rivals from effective distribution channels for general search services, including all search access points on the Android mobile device ecosystem.

229. Google also exploits its monopoly power to deny rival firms access to user queries, which prevents them from getting the scale necessary to effectively compete with Google. Scale is essential for building, improving, and sustaining a general search engine. Google denies rivals competitive conditions to achieve this scale, which serves as a barrier to entry and further entrenches Google's monopoly power.

230. Google also stunts innovation and investment in new products that could serve as (a) alternative search access points and search technologies and (b) full or partial substitutes to Google's general search engine. By restricting competition in general search services, including by excluding any search service that Google determines in its discretion is "similar" to "Google Search," Google insulates itself from competitive pressure to improve its general search offering.

This harms consumers by, for example, reducing the quality of general search services — including as it impacts privacy, data protection, and use of consumer data — and reducing innovation, output, and choice in general search services.

231. Google's unlawful conduct also further entrenches its monopoly power in search and related markets. Google exploits its monopoly power in general search to act as the gateway to the internet, which it uses to promote its own web content and increase its profits. Google originally claimed to be the "turnstile" to the internet, sending users off its results pages through organic links designed to connect the user with a third-party website that would best "answer" a user query. Over time, however, Google has pushed the organic links further down the search engine results page, featuring more search advertising results and Google's own vertical offerings. This, in turn, has demoted organic links of third-party verticals, pushing these links "below-the-fold" (*i.e.*, on the portion of the search engine results page that is visible only if the user scrolls down) and requiring these third parties (including brands and advertisers) to buy more search advertising from Google to remain relevant. This raises their costs, reduces their competitiveness, and limits their incentive and ability to invest in innovations that could be attractive to users.

232. Absent Google's exclusionary agreements and other conduct, dynamic competition for general search services would lead to higher quality search, increased consumer choice, and a more beneficial user experience. Plus, the incentives and abilities for companies to develop and distribute innovative and alternative search products would be restored, resulting in more options, better products, and higher consumer welfare.

**C. Android App Distribution**

233. Google's anticompetitive conduct also has foreclosed and continues to foreclose competition and limit innovation in the Android app distribution market, affecting a substantial volume of commerce in this market, and causing anticompetitive harms to OEMs, competing app

distributors, app developers, and consumers, among others, including as alleged below.

234. Google's anticompetitive conduct harms would-be competitor app distributors. Absent Google's exclusionary restrictions, OEMs could pre-install other app distribution platforms, and the Google Play Store would face competition to distribute apps to Android mobile device users. Through that competition, firms could innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's app store.

235. Google's anticompetitive conduct also harms OEMs and limits their competition. It forces them to dedicate to the Google Play Store and other mandatory Google applications valuable space on their devices' "home screen." This is true even if the OEMs would, under competitive conditions, rather use that real estate for other purposes to differentiate their offerings to consumers, including to offer alternative application search services that would facilitate alternative means of app distribution. Google's conduct also harms OEMs by precluding them from installing or promoting both non-Google application search engines and alternative means of distributing apps, such as Discovery Search, on their devices. Google's exclusionary demands also limit OEMs' ability to innovate and compete with each other by offering application search platforms for mobile apps that are new and more appealing in terms of price, quality, and innovation, including through innovative means of integrating application search and enabling app distribution. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored and different combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

236. Google's anticompetitive conduct also harms and limits competition from and among app developers. They are subjected to Google's anticompetitive terms and conditions, including Google's supra-competitive taxes on app downloads and in-app purchases, if they wish

to reach many Android users, such as through advertising on Google's valuable advertising properties. Google's restrictions prevent developers from experimenting with alternative app distribution models, such as by providing apps directly to consumers, selling apps through curated app stores, creating competing app stores, or forming business relationships with OEMs, who can pre-install apps.

237. Google's anticompetitive conduct also harms consumers in multiple ways. Consumers are denied the fundamental benefits of free and fair competition in Android app distribution because of Google's unlawful conduct, resulting in reduced output, innovation, choice, and quality. Google has thus limited consumers' ability to discover new apps and subjected them to higher prices for app downloads and in-app purchases.

**D. Search Advertising**

238. Google's conduct also has caused and continues to cause substantial anticompetitive effects in the search advertising and search text advertising markets, affecting a substantial volume of commerce in these markets, including as alleged below.

239. Google's anticompetitive conduct has foreclosed no less than 45% of the search text ads market, and that foreclosure has already been found significant by the United States District Court for the District of Columbia.

240. By foreclosing rivals from application search, app distribution, and general search, Google reduces the number of firms competing in these markets for advertisers' dollars, including for search ads and search text ads. This denies rival firms critical revenue necessary to compete with Google in these markets, and reduces the number of search advertising outlets to advertisers.

241. That, in turn, increases Google's power to charge search advertisers, including search text advertisers, more than it could in a competitive market. It also allows Google to reduce the quality of services it provides to advertisers (e.g., by restricting the information it offers to

advertisers) and to reduce innovation and choice in the search advertising market.

242. Absent Google's exclusionary conduct in the markets for Android application search services, Android app distribution, and general search, rival firms in these markets like Branch Discovery Search could develop innovative ways to compete for search and search text advertiser dollars, including innovative advertising strategies better tailored to consumer demand and preferences. Such competition would result in more price competition, allowing advertisers to purchase ads at more attractive terms, with better quality and service. But advertisers and consumers are denied these and other benefits of competition by Google's exclusionary conduct.

## CLAIMS ALLEGED

### COUNT ONE
### Unreasonable Restraints of Trade
### (Sherman Act Section 1 and Clayton Act Section 4)

243. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

244. Branch has Article III and antitrust standing to assert this claim.

245. Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

246. Google has entered into agreements with Android distributors, including Android OEMs and carriers, that unreasonably restrain and harm competition in the Android application search services market, the Android app distribution market, the general search services market, and the search advertising market (including the search text ads submarket).

247. These agreements include Google's MADAs with OEMs. Under these agreements, for example, Google conditions providing its Google Mobile Services package of applications on various anticompetitive restrictions — including coercing OEMs to (a) install a bundle of Google's

dominant applications (including the Google Play Store and Google Search); (b) make certain dominant Google applications undeletable and give them prime placement on the default home screen; (c) prohibit or otherwise restrict the pre-installation of alternative app stores; (d) restrict frictionless downloading of apps outside of Google Play through various compatibility standards designed as anticompetitive obstacles; and (e) accept Google's other various terms and conditions, including Google's supra-competitive 30% tax on buying apps and in-app purchases on apps distributed through the Google Play Store.

248. As another example, Google also entered RSAs with distributors, including OEMs and carriers, to further restrict them from fostering competition and to foreclose rivals. These are exclusionary agreements that require distributors, including OEMs and carriers, to set Google as the exclusive default general search and application search engine for all search access points on Android mobile devices, and expressly prohibit distributors from installing any non-Google search product — including any application search technology, such as Branch Discovery Search. Google uses its monopoly profits to pay for this exclusivity by giving OEMs and carriers a percentage of Google's general search and app distribution monopoly revenues and thereby foreclosing rivals, including but not limited to Branch, from getting distribution, on Android mobile devices.

249. Google is able to impose these agreements on distributors by virtue of its monopoly power in Android app distribution and general search services.

250. These agreements serve no legitimate, pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the Android application search services market, the Android app distribution market, the general search services market, and the search advertising market (including its search text advertising submarket).

251. Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation, choice, and quality of service, and lowered output. These agreements have caused competitive harms to OEMs, carriers, competing app search firms, competing general search firms, mobile app developers, Android app distributors, and consumers.

252. These agreements are unlawful *per se* because Google uses these exclusionary restraints to foreclose competition and lock up the entire supply side of the relevant markets. Alternatively, these agreements are unreasonable and unlawful restraints of trade under both quick look analysis and the rule of reason because they have no procompetitive benefits; the anticompetitive effects outweigh any purported procompetitive benefits; or, to the extent any such benefits are claimed, they can be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive means.

253. Google's conduct has affected and continues to affect a substantial volume of interstate and foreign commerce in the relevant markets.

254. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT TWO**
**Unlawful Tying**
**(Sherman Act Section 1 and Clayton Act Section 4)**

255. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

256. Branch has Article III and antitrust standing to assert this claim.

257. Google has imposed illegal tying arrangements on Android distributors that

unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

258. Google ties the distribution of the Google Play Store and Google Search, individually and collectively, to a prohibition on Android mobile device distributors installing or promoting any non-Google alternative search product — including Android application search products, such as Branch Discovery Search. Google coerces Android distributors not to install alternative search products, including application search products, like Branch Discovery Search, because distributors need the Google Play Store and Google Search to offer a commercially viable Android mobile device.

259. The Google Play Store and Google Search are each separate and distinct products from application search products, like Branch Discovery Search.

260. Google has sufficient market power in the tying product markets – Android app distribution and general search services — to appreciably restrain free competition in the market for the tied product — Android application search products like Branch Discovery Search. And Google has demonstrated its ability to leverage its market power in the tying markets to substantially exclude competition in the tied market. Google's tying conduct has affected a substantial amount of interstate and foreign commerce.

261. Google's tying arrangements are a *per se* violation of the antitrust laws.

262. Alternatively, Google's tying arrangements are unlawful restraints of trade under both quick look analysis and the rule of reason. They serve no legitimate, procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the tied product market.

263. Google's tying arrangements have substantial anticompetitive effects in the market

for the tied product, including by foreclosing all competing products and rival firms in the tied product market, and thus decreasing output, innovation, choice, and quality in the tied product market. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's tying arrangements, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

264. As a direct and proximate result of Google's unlawful tying arrangements, Branch has suffered and continues to suffer injury to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT THREE**
**Unlawful Tying**
**(Sherman Act Section 1 and Clayton Act Section 4)**

265. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

266. Branch has Article III and antitrust standing to assert this claim.

267. Google has imposed illegal tying arrangements on Android distributors that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

268. Google ties the distribution of the Google Play Store to Google Search on Android mobile devices. Google coerces Android distributors to pre-install Google Search because distributors need the Google Play Store to offer a commercially viable Android mobile device.

269. The Google Play Store is a separate and distinct product from Google Search.

270. Google has sufficient market power in the tying product market — the Android app

distribution market — to appreciably restrain free competition in the markets for the tied product — the general search services and the Android application search services markets, in which Google Search competes. And Google has demonstrated its ability to leverage its market power in the tying product market to substantially exclude competition in the tied markets. Google's tying conduct has affected a substantial amount of interstate and foreign commerce.

271. Google's tying arrangements are a *per se* violation of the antitrust laws.

272. Alternatively, Google's tying arrangements are unlawful restraints of trade under a quick look analysis or the rule of reason. They serve no legitimate, pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the tied product market.

273. Google's tying arrangements have substantial anticompetitive effects in the markets for the tied product, including by foreclosing all competing products and rival firms in the tied product markets, and thus decreasing output, innovation, choice, and quality in the tied product markets. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's tying arrangements, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

274. As a direct and proximate result of Google's unlawful tying arrangements, Branch has suffered injury and continues to suffer injury to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT FOUR**
**Unlawful Monopoly Maintenance**
**in the Android Application Search Services Market**
**(Sherman Act Section 2 and Clayton Act Section 4)**

275. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

276. Branch has Article III and antitrust standing to assert this claim.

277. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful "to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

278. Google has monopoly power in the Android application search services market.

279. Google has unlawfully maintained that monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, through the anticompetitive conduct alleged above, including unreasonable restraints of trade, exclusive dealing, and tying arrangements. For example, through Google's exclusionary MADAs and RSAs, Google conditions the licensing of the Google Play Store, as well as other dominant and essential Google products, on distributors' agreement to both (a) set Google as the exclusive default general search engine for all search access points on Android mobile devices, including for any Android application search service; and (b) not install any non-Google alternative search product, including Android application search products, such as Branch Discovery Search.

280. Google's exclusionary conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the Android application search services market and has harmed competition and consumers in this market, including by barring distributors from installing any non-Google product in the Android application search services market, thus decreasing output, innovation, choice, and quality. Even if there were purported

procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

281. Google's conduct has affected and continues to affect a substantial amount of interstate and foreign commerce.

282. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT FIVE**
**Unlawful Attempted Monopolization**
**in the Android Application Search Services Market**
**(Sherman Act Section 2 and Clayton Act Section 4)**

283. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

284. Branch has Article III and antitrust standing to assert this claim.

285. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful to "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

286. In the alternative only, if Google does not already have monopoly power in the Android application search services market, then Google has a dangerous probability of achieving monopoly power in that market, and Google has engaged in anticompetitive and exclusionary conduct with a specific intent to monopolize that market.

287. Google's anticompetitive and exclusionary conduct in the Android application search services market includes the unreasonable restraints of trade, exclusive dealing, and tying

arrangements alleged above. For example, through Google's exclusionary MADAs and RSAs, Google conditions the licensing of the Google Play Store, as well as other dominant and essential Google products, on distributors' agreement to both (a) set Google as the exclusive default general search engine for all search access points on Android mobile devices, including for any Android application search service; and (b) not install any non-Google alternative search product, including Android application search products, such as Branch Discovery Search. This conduct reflects a specific intent to monopolize the Android application search services market and a dangerous probability of doing so.

288. Google's exclusionary conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the Android application search services market and has harmed competition and consumers in this market, including by barring distributors from installing any non-Google product in the Android application search services market, thus decreasing output, innovation, choice, and quality. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

289. Google's conduct has affected and continues to affect a substantial amount of interstate and foreign commerce.

290. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT SIX**
**Unlawful Monopoly Maintenance**
**in the General Search Services Market**
**(Sherman Act Section 2 and Clayton Act Section 4)**

291. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

292. Branch has Article III and antitrust standing to assert this claim.

293. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful "to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

294. Google has monopoly power in the general search services market.

295. Google has unlawfully maintained that monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, through the anticompetitive conduct alleged above, including unreasonable restraints of trade, exclusive dealing, and tying arrangements. For example, through Google's exclusionary MADAs and RSAs, Google conditions the licensing of the Google Play Store, as well as other dominant and essential Google products, on distributors' agreement to both (a) set Google as the exclusive default general search engine for all search access points on Android mobile devices; and (b) not install any non-Google alternative search product, including Android application search products, such as Branch Discovery Search.

296. Google's exclusionary conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the general search services market and has harmed competition and consumers in this market, including by barring distributors from installing any non-Google alternative search product, thus decreasing output, innovation, choice, and quality. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be

achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

297. Google's conduct has affected and continues to affect a substantial amount of interstate and foreign commerce.

298. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT SEVEN**
**Unlawful Monopoly Maintenance**
**in the Android App Distribution Market**
**(Sherman Act Section 2 and Clayton Act Section 4)**

299. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

300. Branch has Article III and antitrust standing to assert this claim.

301. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful "to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

302. Google has monopoly power in the Android app distribution market.

303. Google has unlawfully maintained that monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, through the anticompetitive conduct alleged above. This includes conditioning the licensing of the Google Play Store, as well as other dominant and essential Google products, on various anticompetitive restrictions and preferential treatment for the Google Play Store — including coercing OEMs to make the Play Store undeletable and give it prime placement on the default home screen; prohibit or otherwise restrict the pre-installation of

alternative app stores such that the Google Play Store is exclusive; restrict frictionless downloading of apps outside of the Google Play Store (such as through Branch Discovery Search) through various agreements and compatibility standards designed as anticompetitive obstacles; and accept Google's other various terms and conditions, including Google's supra-competitive 30% tax on buying apps and in-app purchases on apps distributed through the Google Play Store.

304. Google's conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the Android app distribution market, increasing prices and costs, and reducing output, innovation, choice, and quality. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

305. Google's conduct affected and continues to affect a substantial volume of interstate and foreign commerce.

306. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

## COUNT EIGHT
## Unlawful Monopoly Maintenance
## in the Search Text Advertising Market
## (Sherman Act Section 2 and Clayton Act Section 4)

307. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

308. Branch has Article III and antitrust standing to assert this claim.

309. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful

"to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

310. Google has monopoly power in the search text advertising submarket of the search advertising market.

311. Google has unlawfully maintained that monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, through the anticompetitive conduct alleged above, including unreasonable restraints of trade, exclusive dealing, and tying arrangements. For example, through Google's exclusionary MADAs and RSAs, Google conditions the licensing of the Google Play Store, as well as other dominant and essential Google products, on distributors' agreement to both (a) set Google as the exclusive default general search engine for all search access points on Android mobile devices; and (b) not install any non-Google alternative search product, including Android application search products, such as Branch Discovery Search.

312. Google's conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the search text advertising market, increasing prices and costs, and reducing output, innovation, choice, and quality. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

313. Google's conduct affected and continues to affect a substantial volume of interstate and foreign commerce.

314. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble

damages for Google's violations of the Sherman Act.

**COUNT NINE**
**Unlawful Attempted Monopolization**
**in the Search Text Advertising Market**
**(Sherman Act Section 2 and Clayton Act Section 4)**

315. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

316. Branch has Article III and antitrust standing to assert this claim.

317. Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful to "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

318. In the alternative only, if Google does not already have monopoly power in the search text advertising market, then Google has a dangerous probability of achieving monopoly power in that market, and Google has engaged in anticompetitive and exclusionary conduct with a specific intent to monopolize that market.

319. Google's anticompetitive and exclusionary conduct in the search text advertising market includes the unreasonable restraints of trade, exclusive dealing, and tying arrangements alleged above. For example, through Google's exclusionary MADAs and RSAs, Google conditions the licensing of the Google Play Store, as well as other dominant and essential Google products, on distributors' agreement to both (a) set Google as the exclusive default general search engine for all search access points on Android mobile devices, including for any Android application search service; and (b) not install any non-Google alternative search product, including Android application search products, such as Branch Discovery Search. This conduct reflects a specific intent to monopolize the search text advertising market and a dangerous probability of doing so.

320. Google's conduct has substantial anticompetitive effects, including by foreclosing and continuing to foreclose a substantial share of the search text advertising market, increasing prices and costs, and reducing output, innovation, choice, and quality. Even if there were purported procompetitive benefits, they are outweighed by the anticompetitive effects of Google's exclusionary conduct, and any purported benefit could be achieved through less restrictive means. The anticompetitive restrictions are not necessary to serve any procompetitive benefits.

321. Google's conduct has affected and continues to affect a substantial amount of interstate and foreign commerce.

322. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violations of the Sherman Act.

**COUNT TEN**
**Unlawful Restraint of Trade**
**(Texas Free Enterprise and Antitrust Act)**

323. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

324. Branch has Article III and antitrust standing to assert this claim.

325. Google's conduct, as alleged above, violates Section 15.05(a) of the Texas Free Enterprise and Antitrust Act, which prohibits "[e]very contract, combination, or conspiracy in restraint of trade." Tex. Bus. & Com. Code § 15.05(a). This includes Google's exclusionary MADAs and RSAs and the unreasonable restraints of trade, exclusive dealing, and tying arrangements they effect in the relevant markets, as discussed above.

326. Google's conduct has substantial anticompetitive effects, including increased

prices and costs, reduced innovation, choice, and quality of service, and lowered output.

327. These agreements have no legitimate justification or procompetitive benefits; the anticompetitive effects outweigh any purported procompetitive benefits; or, to the extent any such benefits are claimed, they can be achieved through less restrictive means.

328. Google's conduct occurred in significant part in Texas, as well as other states, and such conduct has caused anticompetitive harm in Texas.

329. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. And because Google's conduct as alleged above was "willful or flagrant," Tex. Bus. & Com. Code § 15.21(1), Branch is entitled to treble damages, the cost of suit, and all other relief available under the Texas Act.

**COUNT ELEVEN**
**Unlawful Tying**
**(Texas Free Enterprise and Antitrust Act)**

330. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

331. Branch has Article III and antitrust standing to assert this claim.

332. Google's conduct, as alleged above, violates Section 15.05(c) of the Texas Free Enterprise and Antitrust Act, which makes it "unlawful for any person to sell, lease, or contract for the sale or lease of any goods . . . for use, consumption, or resale . . . on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce." Tex. Bus. & Com. Code § 15.05(c).

333. Google's conduct, as alleged above, violates Section 15.05(c) in various respects, including by conditioning distribution of the Google Play Store and Google Search to a prohibition on Android mobile device distributors installing or promoting any non-Google alternative search product — including Android application search services products, such as Discovery Search.

334. The Google Play Store and Google Search are separate and distinct products from alternative search products, including application search products, like Branch Discovery Search. Google has sufficient market power in the tying product markets — Android app distribution, Android mobile browsers, and general search services — to appreciably restrain free competition in the market for the tied product — Android application search products like Branch Discovery Search. And Google has demonstrated its ability to use its market power in the tying markets to substantially exclude competition in the tied market. Google's conduct has numerous anti-competitive effects, including reduced innovation, choice, and quality of service, and lowered output, and substantially forecloses competition in the Android application search services market.

335. Google also unlawfully ties distribution of the Play Store to a requirement that Android mobile device distributors pre-install Google Search on Android mobile devices as the exclusive default.

336. The Google Play Store is a separate and distinct product from Google Search. Google has sufficient market power in the tying product market — the Android app distribution market — to appreciably restrain free competition in the markets for the tied product — the general search services and Android application search services markets, which include products such as Branch Discovery Search. And Google has demonstrated its ability to leverage its market power in the tying product market to substantially exclude competition in the tied market. This tying conduct has numerous anticompetitive effects, including reduced innovation, choice, and quality

of service, and lowered output, and substantially forecloses competition in the Android application search services market.

337. These tying arrangements have no legitimate justification or procompetitive benefits; the anticompetitive effects outweigh any purported procompetitive benefits; or, to the extent any such benefits are claimed, they can be achieved through less restrictive means.

338. Google's conduct occurred in significant part in Texas, as well as other states, and such conduct has caused anticompetitive harm in Texas.

339. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. And because Google's conduct as alleged above was "willful or flagrant," Tex. Bus. & Com. Code § 15.21(1), Branch is entitled to treble damages, the cost of suit, and all other relief available under the Texas Act.

**COUNT TWELVE**
**Unlawful Monopolization and Attempted Monopolization**
**(Texas Free Enterprise and Antitrust Act)**

340. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

341. Branch has Article III and antitrust standing to assert this claim.

342. Google's conduct, as alleged above, violates Section 15.05(b) of the Texas Free Enterprise and Antitrust Act, which makes it unlawful "to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex. Bus. & Com. Code § 15.05(b).

343. As alleged above, (a) Google has monopoly power in the Android application search services market and has unlawfully maintained that monopoly power or, in the alternative, has a dangerous probability of achieving monopoly power and has engaged in anticompetitive and

exclusionary conduct with a specific intent to monopolize that market; (b) Google has monopoly power in the general search services market and has unlawfully maintained that monopoly power; (c) Google has monopoly power in the Android app distribution market and has unlawfully maintained that monopoly power; and (d) Google has monopoly power in the search text advertising market and has unlawfully maintained that monopoly power or, in the alternative, has a dangerous probability of achieving monopoly power and has engaged in anticompetitive and exclusionary conduct with a specific intent to monopolize that market.

344. Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation, choice, and quality of service, and lowered output.

345. Google's conduct occurred in significant part in Texas, as well as other states, and such conduct has caused anticompetitive harm in Texas.

346. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. And because Google's conduct as alleged above was "willful or flagrant," Tex. Bus. & Com. Code § 15.21(1), Branch is entitled to treble damages, the cost of suit, and all other relief available under the Texas Act.

**COUNT THIRTEEN**
**Unreasonable Restraints of Trade**
**(California Cartwright Act)**

347. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

348. Branch has Article III and antitrust standing to assert this claim.

349. Google's conduct, as alleged above, violates the Cartwright Act, which prohibits the combination of resources by two or more persons to restrain trade or commerce or to prevent

market competition. Cal. Bus. & Prof. Code §§ 16720, 16726.

350. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to an anticompetitive scheme.

351. As alleged above, Google has executed agreements with Android distributors, including Android OEMs and carriers, that unreasonably restrain and harm competition in the Android application search services market, the Android app distribution market, the general search services market, and the search advertising market (including the search text advertising submarket). These include Google's MADAs with OEMs. Under these agreements, Google conditions providing its Google Mobile Services package of applications on various anticompetitive restrictions — including coercing OEMs to (a) install a bundle of Google's dominant applications (including Google Play Store and Google Search); (b) make certain dominant Google applications undeletable and give them prime placement on the default home screen; (c) prohibit or otherwise restrict the pre-installation of alternative app stores; (d) restrict frictionless downloading of apps outside of the Google Play Store through various compatibility standards designed as anticompetitive obstacles; and (e) accept Google's other various terms and conditions, including Google's supra-competitive 30% tax on buying apps and in-app purchases on apps distributed through the Google Play Store.

352. Google's unlawful restraints of trade also include its RSAs with distributors, including OEMs and carriers, that further restrict them from fostering competition and foreclose rivals. These are exclusionary agreements that require distributors to set Google as the exclusive default general search engine for all search access points on Android mobile devices, and expressly prohibit distributors from installing any non-Google alternative search product — including

application search technology, such as Branch Discovery Search. Google uses its monopoly profits to pay for this exclusivity by giving OEMs and carriers a percentage of Google's general search monopoly revenues and thereby foreclosing rivals, including but not limited to Branch, from getting distribution, on Android mobile devices.

353. Google is able to impose these agreements on distributors by virtue of its market power in Android app distribution and general search services.

354. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation, choice, and quality of service, and lowered output.

355. Google's conduct occurred in significant part in California, as well as other states, and such conduct has caused anticompetitive effects in California, as well as other states.

356. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violation of the Cartwright Act.

**COUNT FOURTEEN**
**Unlawful Tying**
**(California Cartwright Act)**

357. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

358. Branch has Article III and antitrust standing to assert this claim.

359. Google's conduct, as alleged above, violates the Cartwright Act, which prohibits the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. Cal. Bus. & Prof. Code §§ 16720, 16726. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market

participants to involuntarily adhere to an anticompetitive scheme. The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." Cal. Bus. & Prof. Code § 16727.

360. For example, as alleged above, Google unlawfully ties distribution of the Google Play Store and Google Search, individually and collectively, to a prohibition on Android mobile device distributors installing or promoting any non-Google alternative search product — including Android application search products, such as Branch Discovery Search. The Google Play Store and Google Search are separate and distinct products from alternative search products, including application search products, like Branch Discovery Search. Google has sufficient market power in the tying product markets — Android app distribution and general search services — to appreciably restrain free competition in the market for the tied product — Android application search products, such as Branch Discovery Search. And Google has demonstrated its ability to use its market power in the tying markets to substantially exclude competition in the tied market.

361. Google's conduct has numerous anticompetitive effects, including reduced innovation, choice, and quality of service, and lowered output, and substantially forecloses competition in the Android application search market.

362. Google also unlawfully ties distribution of the Google Play Store to a requirement

that Android mobile device distributors pre-install Google Search on Android mobile devices as the exclusive default. The Play Store is a separate and distinct product from Google Search. Google has sufficient market power in the tying product market — the Android app distribution market — to appreciably restrain free competition in the markets for the tied product — the general search services and Android application search services markets. And Google has demonstrated its ability to use its market power in the tying product market to substantially exclude competition in the tied markets. Google's conduct has numerous anticompetitive effects, including reduced innovation, choice, and quality of service, and lowered output, and substantially forecloses competition in the general search and Android application search services markets.

363. These tying arrangements have no legitimate justification or procompetitive benefits; the anticompetitive effects outweigh any purported procompetitive benefits; or, to the extent any such benefits are claimed, they can be achieved through less restrictive means.

364. Google's conduct occurred in significant part in California, as well as other states, and such conduct has caused anticompetitive effects in California, as well as other states.

365. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove the amount of money damages caused by Google's unlawful conduct. Branch is entitled to treble damages for Google's violation of the Cartwright Act.

**COUNT FIFTEEN**
**Interference with Prospective Contractual or Business Relations**

366. Branch restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth here.

367. Branch has standing to bring this claim.

368. Google interfered and continues to interfere with the prospective contractual or

business relations that Branch would receive from Samsung, AT&T, and other Android OEMs and carriers through partnerships to integrate Branch Discovery Search on Android mobile devices.

369. Google was aware of Branch Discovery Search's initial, limited integration on Samsung mobile devices, and the plans to expand that integration. But Google secretly used and continues to use its market power to interfere with Branch's prospective relations with Samsung and other OEMs and carriers, like AT&T.

370. For example, Google interfered by expanding the exclusivity under its RSAs with OEMs and carriers through an amended definition of prohibited alternative search services. This prevents OEMs from installing "any web or on-device search service (including on-device search that incorporates multiple vertical search functionalities) that offers functionality that is similar to Google Search." Google's conduct in expanding this definition was specifically targeted at Branch and resulted from Samsung's pre-installation of Branch's application search technology — which Google had actual knowledge of and has intentionally scuttled.

371. Google's conduct has had the intended result: Samsung and other OEMs and carriers cannot integrate and pre-install Branch Discovery Search without breaching their unlawful contracts with Google, thereby losing their ability to access the Google Play Store and other dominant Google products and receive their share of Google's monopoly profits.

372. Google was not and is not privileged to interfere with Branch's prospective economic relations, and Google's interference was and remains illegal and wrongful under various independent sources of law, including federal antitrust law, Texas and California antitrust law, and Texas and California common law.

373. As a direct and proximate result of Google's unlawful conduct, Branch has suffered and continues to suffer injury and damages to its business or property. At trial, Branch will prove

the amount of money damages caused by Google's unlawful conduct.

## DEMAND FOR JURY TRIAL

374. Branch hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

Plaintiff Branch Metrics, Inc. requests that, following a jury trial in this case, the Court enter judgment in its favor and against Defendant Google LLC as follows:

A. Declaring that the challenged agreements are unlawful restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. Declaring that Google violated Section 2 of the Sherman Act, 15 U.S.C. § 2, for its conduct to (i) unlawfully maintain an Android application search services monopoly or, in the alternative, unlawfully attempt to monopolize the Android application search services market; (ii) unlawfully maintain a general search services monopoly; (iii) unlawfully maintain an Android app distribution monopoly; and (iv) unlawfully maintain a search text advertising monopoly or, in the alternative, unlawfully attempt to monopolize the search text advertising market.

C. Declaring that Google acted unlawfully and violated state law as alleged;

D. Awarding Branch all forms and amounts of damages recoverable under the federal antitrust laws, with the total damages amount trebled in accordance with such laws;

E. Awarding Branch all forms and amounts of damages recoverable under the state law causes of action, in an amount to be proven at trial, and trebled in accordance with such laws;

F. Enjoining the unlawful conduct;

G. Entering structural relief as needed to cure any anticompetitive harm;

H. Awarding Branch its reasonable costs and expenses incurred in connection with this action, including expert fees and attorneys' fees; and

I. Awarding such other relief that the Court deems just and proper.

Date: January 31, 2025

Respectfully submitted,

*/s/ Claire Abernathy Henry*
Neal Manne
Alex Kaplan
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
nmanne@susmangodfrey.com
akaplan@susmangodfrey.com

John Schiltz
Danielle Nicholson
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101

Tel: (206) 505-3841
Fax: (206) 516-3883
jschiltz@susmangodfrey.com
dnicholson@susmangodfrey.com

Zachary B. Savage
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001-8602
Tel: (212) 336-8330
Fax: (212) 336-8340
zsavage@susmangodfrey.com

Of Counsel:
Claire Abernathy Henry
State Bar No. 24053063
claire@millerfairhenry.com
MILLER FAIR HENRY, PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

Steven C. Holtzman
20 Hillcrest Road
Berkeley CA 94705
(510) 333-4612
Sholtzman10@outlook.com

***Counsel for Branch Metrics, Inc.***